UNITED STATES of America

v.

Martin MILLER, Defendant.

No. CR 94–0419 (PLF/JMF).

United States District Court,
District of Columbia.

Oct. 28, 1999.

Leigh A. Kenny, Teresa Alva, Federal Public Defender for D.C., Washington, DC, for Defendant.

**Memorandum, Findings of Fact, and Recommended Disposition**

FACCIOLA, United States Magistrate Judge.

This matter has been referred to me to ascertain the value of certain properties which the defendant, Martin Miller ("Miller") surrendered to his partners incident to his plea of guilty to wire fraud.

To fulfill that responsibility, I appointed Ira Ratner, ("Ratner") a certified public accountant and member of the American Academy of Appraisers, to prepare an evaluation of the properties. To insure that the defendant would be able to mount a fair challenge to Ratner's opinion, I authorized the defendant to retain an expert appraiser. The defendant retained Richard Champion ("Champion"), a certified public accountant and attorney, who the government accepted as an expert permitted to express an opinion as to the value of real property.

Ratner performed his appraisal with such commendable objectivity and fairness that Champion, and therefore Miller does not quarrel at all with his estimate of the value of three of the five properties at issue. *Memorandum form Richard H. Champion to Teresa Alva, Esq., Exhibit A to Defendant's Position Regarding Value of Interests and Restitution, filed September 22, 1999* (hereafter "Memorandum"). As to the remaining two, Miller does not claim that Ratner's approach was invalid or inaccurate. He insists, however, that there is an equally valid approach to the valuation of these two properties which should be used instead. *Id.*

For the reasons to be stated herein, I will accept Ratner's estimates as to all the properties and reject Champion's as to the two for which Champion proposes an alternative appraisal..

## The Properties at Issue and Ratner's Appraisal

The defendant surrendered his interest in five partnerships. Appraisal is, by its nature, an estimate and Ratner arrived at the following range of values for the interests which the defendant surrendered:

| | | |
|---|---|---|
| Lamont Street Associates | 0 | 0 |
| Fifth Street Venture | 30,902. | 40,434 |
| Adams Place Associates | 2,409 | 5,559 |
| Douglas Street Associates | 38,987 | 42,836 |
| Fifth Street Associates | 0 | 0 |

The sum of these figures indicates that the total range of values is therefore $72, 298–$88, 829, rounded to $72,000 and $88,-000 which Ratner estimates to be the value of the interests Miller surrendered to his partners. Report of Ian Ratner, May 12, 1999 at 7. (hereafter "Report").

Champion acknowledged that Ratner used generally accepted practices of real estate valuation. Tr. 88 [1] Champion insisted, however, that there were equally valid approaches as to two of the properties which would have yielded a greater value than Ratner opined. To understand the difference, one first has to understand Ratner's approaches to the appraisal of each of them.

**Fifth Street Ventures.** The primary assets of this partnership are a strip mall, which contains several stores, and an auto body and repair shop which is behind the strip mall.

The date of valuation for the assets Miller surrendered is December 31, 1994 and on April 6, 1995 Miller's erstwhile partners sold the strip mall for $762,500. The partners still own the site of the repair shop.

One of the three well accepted appraisal technique is to compare the property in question to the price paid for comparable

pieces of property. *See In re SM 104 Limited,* 160 B.R. 202, 211–212 (S.D.Fla. 1993). The sale of the property to be valued itself eliminates the need to search for comparables; what a willing buyer paid a willing seller for the property is the best evidence of its value. Tr. 18, 66. Ratner used the price paid for the strip mall, $762, 500, as its fair market value as of December 31, 1994 and as a reasonable basis upon which to predicate the value of the repair shop. Dividing the purchase price by the square feet of the strip mall yielded a price per square foot which was then multiplied by the square feet of the repair shop to yield the value of the repair shop.

Using a factor of plus or minus 5% to create a range of values, Ratner concluded that the two primary assets of Fifth Street Ventures had a range of values from $1,124, 668 to $1, 162, 813. Ratner had secured from this partnership the balance sheet of Fifth Street Ventures as of December 31, 1994. On this balance sheet he substituted for the book value [2] of the properties this range of fair market values and then arrived at a restated statement of this partnership's assets (cash, other assets, building, and land). Subtracting from those assets the liabilities he arrived at the value of the assets of the Fifth Street Venture. Assuming their liquidation, he returned to the partners' capital accounts what was due to those accounts and arrived at an amount which represented the excess due to the partners. He then allocated to Miller his portion of the excess and his return of unexpended capital. When all this was done, it resulted in an estimate of the value of Miller's interest in Fifth Street Ventures of between $30, 902 and $40,434. Tr. 19–20

Champion certainly did not disagree with this approach; to the contrary, he indicated that it employed generally accepted practices of valuation. Tr. 88. Mil-

---

1. "Tr" followed by a digit is a reference to the page or pages of the transcript of the hearing held before me on September 23, 1999.

2. Book value is the cost to the partnership of the land and the buildings on it. Tr.

ler otherwise had no quarrel with Ratner's derivation of the value of Miller's interest. It involved nothing more than the application of traditional accounting principles and arithmetic to what the partnership's own records established. Champion insisted, however, that there is an equally valid approach which would have attributed a greater value to Miller's interest. Under that approach, the value would consist of multiplying the income yielded by the two properties per annum and multiplying it by a capitalization rate to arrive at a value. The capitalization rate is said to be based on the general experience in a particular market. Champion, claiming familiarity with the real estate market in the District of Columbia at the time in question, deduced it be 10 to 11% which yielded a greater value for Miller's interest than Ratner derived. *Memorandum, passim;* Tr. 88–89. Thus, while Ratner concluded that Miller's interest in this property had a value between $30, 902 and $40, 434 Champion valued that interest at $44, 726.

First, and despite Champion's suggestion to the contrary (*Memorandum* at 3), use of Ratner's approach does Miller no unfairness. While the sale of the strip mall took place four months after the transfer date of Miller's interest in it, nothing happened in those months in the national or regional economy which could possibly suggest some reason why the value of the property in April, 1995, was depressed as opposed to its value in December, 1994.[3] Nor is there any reason to believe that the partners who sold the property in April would have, for some unknown reason, acted against their own economic interests and accepted a price less than what they thought the property was worth. As Ratner explained, the actual price paid for a property in an arms-length transaction is the best possible evidence of its value. That this price was paid a mere few months after the valuation date hardly weakens its probative force.

The existence of an alternative in itself cannot, as a matter of logic, require the rejection of an admittedly valid approach and the substitution of Champion's for it.

Moreover, I believe that Champion's capitalization rate approach is problematic. It appears all too much a rough "rule of thumb." There was no explanation of how, for example, the capitalization rate of 10% to 11% compares with other investments competing for capital, from certificates of deposit through stock index funds to junk bonds, and why comparing the potential risk of an investment in these instruments with the risk of investment in this property permits the deduction of the capitalization rate Champion champions. On the facts before me, to use this capitalization rate and to reject a value premised on an actual sale of a portion of the property at arms length is truly counter intuitive and improper.

**Lamont Street.** This property, 701 Lamont Street, N.W., has unfortunately been the partners "white elephant." It is an older building which requires substantial maintenance because of its age; for example, the partners has to clean up a chemical leak to avoid governmental enforcement action. Tr. 44. At one point, the Drug Enforcement Administration was the tenant. Ironically, the DEA did not renew the lease because of narcotic activity in open air drug markets the area. Tr. 104. The DEA left at some point in 1994 so that on the valuation date, December 31, 1994, the building was empty. With the exception of a few tenants who rented some space in the building, the building has been empty ever since. The partners have been trying to sell it and it has now been for sale for at least 71 months. Tr 44. While the asking price is $1,200, 000 the partners have indicated to Ratner that they would take $800, 000 and Ratner used the latter as the lower end of the range of his derivation of the value of the property.

---

3. According to the Federal Reserve System website, the prime rate of interest was 9.0% on April 6, 1995 and 8.5% on December 31, 1994.

He posited $1,000,000 as the upper range. Tr. 44–45; Report, Schedule 1, Lamont.

To make matters worse for the partners, the property is highly leveraged. $1,054,500 was due on the property on the valuation date. Since the amount owed the bank was greater than the higher end of the range Ratner concluded that Miller's interest had no value whatsoever on the valuation date.

Champion quarrels with Ratner's conclusion and again argues that an income approach in which annual rents are capitalized at a capitalization rate yields an equally valid estimate of value.

█ While I see the correctness of an income approach based on the capitalization of the rents being generated by existing leaseholds as a means of ascertaining value,[4] that cannot be the approach here. On the valuation date, the building was empty. There were therefore literally no rents to capitalize. Champion admittedly projects the capitalized income from the rents that were paid by the departed tenant. But, that necessarily requires the assumption that the partnership would be able to find a tenant who would be willing to (a) lease the building and (b) pay at least the same rent as the departed tenant. There is, of course, not a shred an evidence before me justifying such assumptions. Courts universally reject as speculative an appraisal approach based on future profits from a business. *Nichols*, § 19.06. Projecting the rental income from a vacant building, using the rents paid by departed tenants, who left because the building and surrounding area were unattractive is, if any thing, more speculative (and irrational) than projecting the future income and resulting profits of an ongoing, successful business. Moreover, even if I accepted such an approach, I would have to accept on faith that the new tenant would pay what the old tenant was paying and not bargain for a better rate even though the building is empty and the potential tenant has the upper hand in any negotiation.

Additionally, Champion uses the same or a similar capitalization rate for the vacant Lamont Street building as he does for the occupied strip mall, which was generating rents, I cannot believe that any investor would rate the risk in investing in an income producing property to be equal to the risk involved in investing in one that is not generating any income. Second, as I have already pointed out, Champion never compares his capitalization rate with the rates available in capital markets for other investments. Without any calibration of the capitalization rate Champion uses to existing markets conditions, I would have to believe that an investor would be willing to invest in a vacant building, not generating income, without considering the then existing yield of much less speculative investments which were yielding income. I cannot accept that any rational person, acting in his own best economic interest, pay as much for a vacant building as an occupied building without even considering less speculative investments for her money.

While the Champion analysis is insufficient, it does not follow that the building had no value. It means only that the capitalization approach Champion advocates is premised on equal parts of speculation and counter intuitive economic thinking. The building had some value and the partners understandably have paid down the debt on it to prevent its foreclosure by the bank which held the note. But, the very narrow question presented is whether there is any evidence that a building which was encumbered with a debt of $,1054,500 on December 31, 1994 had a fair market value greater than that debt when (a) the building was vacant on the valuation date and (b) the prior tenant had

---

**4.** 5 Julius L. Sackman, *Nichols on Eminent Domain* § 19.03 (3d ed.1999) (hereafter "Nichols").

8

left the building because of the social deterioration of the neighborhood and (c) the building has been for sale for five years at $1,200,000 and there have been no takers and (d) the owners have expressly a willingness to accept $800,000 for the building if they can get it. Obviously, there is no such evidence whatsoever and I therefore conclude that on the valuation date this property did not have a value greater than the indebtedness due on it and that therefore Miller's surrender of his interest in it had no value.

## FINDINGS OF FACT

In accordance with the order of referral I therefore find as a fact that the partnership interests transferred by the defendant, Martin Miller, had the value estimated by Ratner, i.e., no more than $88,000 and no less than $72,000.

## RECOMMENDED DISPOSITION

I recommend that there be offset against the $173,000 which Miller must pay in restitution no more than $88,000. This is particularly generous to Miller. It is the high range of Ratner's estimate and values Miller's undivided interest in a partnership's assets as if it were a fee interest. A buyer of Miller's partnership interest would only be buying an equal right with her partners to control the disposition of the partnership's assets. As Ratner explained, that buyer would not pay the same for that interest as she would for a fee interest and the untrammeled right to dispose of the property as she alone saw fit. Tr. 23–24.