

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-21-2005

# Zhang v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-2111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Zhang v. Atty Gen USA" (2005). *2005 Decisions*. Paper 1272.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1272

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2111

XIU LING ZHANG,

Petitioner

v.

ALBERTO GONZALES[1], ATTORNEY GENERAL
OF THE UNITED STATES OF AMERICA,

Respondent

ON PETITION FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

(No. A77-293-449)

Argued January 18, 2005

Before: ALITO, McKEE, and SMITH, Circuit Judges

(Opinion filed: April 21, 2005)

_____

[1]Substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Joshua Bardavid (argued)
Theodore N. Cox
Law Office of Theodore N. Cox
401 Broadway, Suite 701
New York, NY 10013
*Attorney for Petitioner*

Lyle D. Jentzer
Peter D. Keisler
Terri J. Scadron
Hillel R. Smith (argued)
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
*Attorneys for Respondent*

-----

OPINION OF THE COURT

-----

ALITO, Circuit Judge:

Petitioner Xiu Ling Zhang, a native and citizen of the People's Republic of China, petitions for review of an order by the Board of Immigration Appeals ("BIA") denying asylum and withholding of removal.[2] She argues, among other things, that the Immigration Judge ("IJ") failed to reconcile his decision with the documentary evidence she produced. We grant Zhang's petition for review, vacate the order of the BIA, and remand to the BIA for further proceedings consistent with this Court's opinion in Liu v. Ashcroft, 372 F.3d 529 (3d Cir. 2004).

-----

[2]Zhang's counsel admitted at oral argument that he did not preserve for appeal a claim under the United Nations Convention Against Torture.

2

I.

In November 1999, Zhang arrived in the United States without a valid immigrant visa. Joint Appendix ("App.") at 190. An asylum officer found that she had a credible fear of persecution if repatriated to the People's Republic of China and issued her a Notice to Appear before an IJ so that she could apply for asylum. Id. In March 2000, Zhang filed an application for asylum, withholding of removal, and relief under Article III of the United Nations Convention Against Torture.[3] She alleged that Chinese family planning authorities had, among other things, subjected her to a forced abortion and demanded that she or her husband be sterilized to prevent any further violations of the country's one-child policy.

At a preliminary hearing on July 13, 2000, Zhang's lawyer gave the IJ and opposing counsel a number of documents to corroborate these claims. See id. at 50-51. The materials included birth certificates for Zhang, her husband, and her three children; Zhang's marriage certificate; a receipt indicating that Zhang was fined 3000 Yuan[4] for removing an intrauterine device ("IUD") without permission and another receipt showing that Zhang was fined 5000 Yuan for "attempt to give birth secretly." Id. at 103-04. The latter receipt was dated March 26, 1996. App. at 104.

Zhang also submitted two other potentially important documents. The first was a Birth Control Surgery Certificate from Changle City stating that Zhang "was conducted with a Abortion Operation and IUD installation on March 15[, 1996] at our Clinic."

---

[3] The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231).

[4] The Yuan, also known as "RMB," is worth approximately 12 cents. There are roughly 8.2 Yuan per dollar, so 3000 Yuan is about $366, and 5000 Yuan is about $608.

App. at 102. This document is affixed with a seal. The second is a notice addressed to Zhang and her husband from the "Birth Control Office of Shouzhan Town Changle City." As translated, this notice states:

> According to the result of our investigation, you gave two over birth boys in somewhere else, which violated the nation's family planning policies severely. Therefore, according to the penalty regulation of the family planning policies, you must pay a fine of thirty-six thousand Yuan within thirty days. [I]n the meantime, one of you must go to the local hospital for the sterilization operation. Otherwise, [we] will be force[d] to complete the sterilization operation, and punish severely as well.

pp. at 111-12 (emphasis added). This document is also affixed with a seal.

After Zhang's counsel furnished these documents during the July 13 preliminary hearing, the government's lawyer asked if Zhang's counsel intended to comply with 8 C.F.R. § 287.6[5] and "have any documents authenticated by the U.S. consulate in China." App. at 51. Zhang's counsel responded that he had no intention to do so at that point. The IJ then interjected:

---

[5]This regulation states, in pertinent part:

> In any proceeding under this chapter, an official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized. . . . The attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept.

8 C.F.R. §§ 287.6(b)(1)-(2).

4

Bear with me a second. That's one of the more troubling regulations because it's a regulation that imposes a requirement upon people to get things authenticated. The reality, I think, is that it's almost impossible to get that actually done. But there is a requirement. I'll make a decision on that at the time of the hearing. I'm not going to make a decision now.

App. at 52.

The IJ, however, never revisited the question whether the documents had been adequately authenticated. The IJ referred to the documents at the outset of his oral opinion, stating: "The Court also has Exhibit 4 which consists of some documents submitted by the respondent to corroborate her claim." See App. at 10. But what the IJ meant when he said that he "ha[d]" the documents is unclear. It is possible that he meant that the documents were part of the official record that was before him, but it is also conceivable that he merely meant that the documents had been submitted and not that he regarded them as part of the record.

II.

At her merits hearing on October 13, 2000, Zhang testified that Chinese family planning officials subjected her to a forced abortion, fitted her with an IUD on three separate occasions, and demanded that she or her husband be sterilized to prevent any future pregnancies. The IJ denied Zhang's petition based entirely on an adverse credibility determination. See App. at 95 ("Ma'am, I didn't believe any of your testimony."). He explained that Zhang's story appeared "scripted" and "unbelievable" because neither the overall story nor certain pieces of it seemed plausible. App. at 12. After mentioning several perceived inconsistencies in Zhang's testimony, the IJ observed that "there is nothing really in the State Department's Profile that would lead us to believe that forced abortions are anything other than a very rare exception." App. at 17. He continued:

There is evidence that [forced abortions] have

5

occurred but there is also evidence that meteors have landed in the United States. I mean the fact that there's evidence that something happened to someone else doesn't mean that it happened to [Zhang]. There has to be a background of country conditions that form a context and make the story plausible. When someone is going to come in and say th[ey] had a forcible abortion it's not enough to say, "Well, I guess that's possible." <u>I'm going to want some proof that it's more than just possible, that there is a substantial chance that this thing, in fact, happened.</u>

App. at 9 (emphasis added). The IJ concluded that "we basically have a long shot happening here, which is a forced abortion, and we also have very poor testimony. So when you combine the two things together you have no way of succeeding in a case like this." App. at 17-18.

The IJ acknowledged that Zhang's "testimony was quite consistent with her written asylum application," but he never explained why the documents that she submitted did not bolster her credibility. App. at 12. In fact, it is impossible to tell precisely what role – if any – the documents played in the IJ's analysis.

The IJ obviously did not take the documents at face value. If authentic and accurate, they powerfully corroborate Zhang's claims.[6] The abortion certificate would show that she had an

---

[6]To be eligible for asylum, Zhang must show that she is a "refugee," which means that she is unwilling or unable to return to China "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion."

6

abortion on or about March 15, 1996. Viewed in conjunction with this certificate, the March 26, 1996, notice fining Zhang for an "attempt to give birth secretly" would give rise to a strong inference that the abortion was involuntary. And of course if Zhang was forced to undergo an abortion, that would mean that she was subjected to past persecution, and she would be entitled to the benefit of a rebuttable presumption that she has a well-founded fear of further persecution if removed to China. See 8 U.S.C. §§ 1101(a)(42)(A) and (B); 8 C.F.R. § 208.16(b). Similarly, the document ordering Zhang or her husband to submit to a sterilization procedure on pain of severe punishment would corroborate Zhang's testimony that the Chinese authorities threatened her with forced sterilization and would bolster her claim that she has a well-founded fear that she would again be threatened with forced sterilization if she were sent back to her native country.

Because of the significance that the documents in question would have if they are authentic and accurate, it is obvious that the IJ must have given them reduced weight or no weight at all. Cf. Liu v. Ashcroft, 372 F.3d 529, 532 n.3 (3d Cir. 2004) (discussing an IJ's evidentiary rulings on two abortion certificates that "are ambiguous as to whether he intended to give the certificates 'little weight' or 'no weight.'"). The IJ never explained which of these options he chose or why he did so.

---

Id. § 1101(a)(42)(B); Chen v. Ashcroft, 376 F.3d 215, 222-23 (3d Cir. 2004). "The standard for withholding of removal is higher than, albeit similar to, the standard for asylum." Lukwago v. Ashcroft, 329 F.3d 157, 182 (3d Cir. 2003) (citation omitted). The applicant must show that future persecution based on political opinion or other factors is "more likely than not" to occur. 8 C.F.R. § 208.16(b). "A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution." See Chen v. Ashcroft, 381 F.3d 221, 224 (3d Cir. 2004) (citations omitted); 8 C.F.R. § 1208.13(b)(1); In re C-Y-Z-, 21 I & N Dec. 915, 918, 1997 WL 353222 (B.I.A. 1997).

7

On appeal, the BIA issued a one-paragraph affirmance. It adopted the IJ's decision and added a single sentence of its own. "In light of the questions raised by the respondent's credibility, the authenticity of the supporting documents that she presented [], and the respondent's failure to adequately explain the lack of corroboration [], the respondent did not meet her burden of proof to establish her eligibility for the reliefs requested." App. at 2.

III.

This Court must review the administrative record on which the final removal order is based. See Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002). The "final order" to be reviewed is usually that of the Board of Immigration Appeals, but when the BIA simply states "that it affirms the IJ's decision for the reasons set forth in that decision, . . . the IJ's opinion effectively becomes the BIA's, and, accordingly, a court must review the IJ's decision." Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001) (quoting Chen v. INS, 87 F.3d 5, 7 (1ˢᵗ Cir. 1996) (internal citations omitted)). Here, to the extent that the BIA adopted the IJ's opinion, we treat that opinion as the opinion of the Board.[7] See Miah v. Ashcroft, 346 F.3d 434, 439 (3d Cir. 2003) (reviewing "both the decision of the IJ and the BIA" because the BIA adopted some parts of the IJ's opinion); Abdulai, 239 F.3d at 549 n.2 ("When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate.").

Ordinarily, we will affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. See Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998). This deferential standard dictates that the IJ's findings "must be upheld unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 483 (3d Cir. 2001) (citing INS v. Elias-Zacarias, 502

---

[7]Therefore, all references below to the IJ's opinion should be understood as "the IJ's opinion insofar as it was adopted or relied upon by the BIA."

U.S. 478, 481 & n.1 (1992)). However, "remand is appropriate where . . . we have made a legal determination (e.g., regarding the admissibility of evidence) that fundamentally upsets the balancing of facts and evidence upon which an agency's decision is based." Liu v. Ashcroft, 372 F.3d 529, 534 (3d Cir. 2004). See also Leia v. Ashcroft, 393 F.3d 427, 434-35 (3d Cir. 2005); Diallo v. INS, 232 F.3d 279, 287 (2d Cir. 2000). In Liu, "the improper rejection of unauthenticated abortion certificates by the IJ infected the adverse credibility determination," justifying a remand. Chen v. Ashcroft, 376 F.3d 215, 226 (3d Cir. 2004).

IV.

As previously noted, it is possible that the IJ in this case refused to admit the documents in question and thus gave them no weight. It is also possible that the IJ admitted the documents but found that they were entitled to less weight than they would appear to merit if accepted at face value. Without further explanation, however, neither approach can be sustained.

A.

We cannot sustain the exclusion of the documents without an explanation of the basis for the ruling. The IJ may have excluded the documents for failure to comply with 8 C.F.R. § 287.6, which states that "an official record . . . shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized. . . ." Id. (emphasis added). This regulation adds that "[t]he attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept." Id. Our court, however, recently held that "8 C.F.R. § 287.6 is not an absolute rule of exclusion, and is not the exclusive means of authenticating records before an immigration judge." Liu, 372 F.3d at 533. See also Leia v. Ashcroft, 393 F.3d 427, 434-35 (3d Cir. 2005) (remanding for consideration under Liu where an IJ found that § 287.6 was the exclusive means to

9

authenticate documents).[8]   Accordingly, exclusion of the documents on this ground would be legal error. Because of the real possibility that the IJ excluded the documents in question pursuant to this regulation, we must vacate the order of the BIA and remand for clarification on this point.

It is also possible, as noted, that the IJ did not rely on 8 C.F.R. § 287.6 but found for some other reason or reasons that the documents were not entitled to any appreciable weight.   But because the IJ's opinion does not disclose his reasoning on this matter, it is impossible for us to discharge our responsibilty to determine whether, as Zhang contends, the evidence in the record compels the conclusion that she faces a probability of or at least has a well-founded fear of persecution if she is removed to the People's Republic.  As noted, the documents at issue, if accepted as genuine and accurate, strongly corroborate Zhang's testimony. Thus, unless they were excluded for some undisclosed procedural reason (the propriety of which we obviously cannot review) or unless they were properly deemed to be unreliable or untrustworthy, see Ezeagwuna v. Ashcroft, 325 F.3d 396, 405-06 (3d Cir. 2003), they could compel findings quite different from those that the IJ reached.

B.

Several possible grounds for the IJ's treatment of the documents come to mind. One possibility is that the IJ thought that the cross-examination of Zhang provided a basis for doubting the documents' authenticity. The government attorney asked Zhang why some of the Chinese "notarial certificates" that she had

---

[8]Moreover, even if compliance with 8 C.F.R. § 287.6 were mandatory, some explanation for the exclusion of the documents would still be needed because at least some of the documents bear seals.  Cf. Georgis v. Ashcroft, 328 F.3d 962, 966 n.3 (7th Cir. 2003) (faulting an IJ for not addressing whether a submitted copy of a letter is "not already certified" pursuant to § 287.6 because it "appears to be imprinted with an official seal of some sort").

submitted were dated February 25, 2000, which was after she entered the United States. See App. at 89-92. The hearing transcript unhelpfully reports Zhang's answer as: "My (indiscernible) just helped me to obtain it." Id. at 90. The government's lawyer apparently believed that Zhang said that her husband had helped her obtain the notarial certificates, and the lawyer thus began questioning Zhang about her husband, who was in hiding 600 kilometers from Fujian province. When the government lawyer eventually returned to his original question about who helped Zhang acquire the certificates, the transcript records Zhang's answer as follows: "That's my husband did." Id. at 91. Shortly thereafter, when asked again, Zhang replied, "No. It's not my husband himself. I said my husband's dad got them. . . . I never say my husband. I just keep on saying that's my dad – my husband's dad." Id. at 92.

This exchange, as translated from Foo Chow to English, is muddled at best. It is difficult to say that this supposed discrepancy in testimony is enough in itself to impugn the authenticity of the birth certificates in the record. Moreover, even if it did, the abortion certificate and the documents relating to the fine for removal of the IUD and the threat of involuntary sterilization were never directly discredited.

Another possibility, which was discussed at oral argument, is that the IJ relied on a State Department Report, dated April 14, 1998, noting that documentation from certain parts of China, including "documents that purportedly verify . . . birth control measures," "is subject to widespread fabrication and fraud." App. at 166. According to this Report, in the Fujian province in particular, where Zhang lived, "no reliable documents existed to prove relationships." Id. at 166-67. Indeed, the Report notes, when the Consulate General in the region requested in 1993 that officials in Fujian investigate suspected fake documents, 66 of the 109 that were investigated "were determined to be incorrect or fake." App. at 167.

Persuasive as the report might seem, we have previously counseled wariness regarding "wholesale reliance on the Department of State's country reports." Chen v. Ashcroft, 376

11

F.3d 215, 225-26 (3d Cir. 2004) (citations omitted) (holding that the BIA "erroneously rejected the validity of [two] abortion certificates based on nothing more than the country report"). See also Lin v. INS, 238 F.3d 239, 248 (3d Cir. 2001) (quoting Galina v. INS, 213 F.3d 955, 959 (7th Cir. 2000)). A cautious approach is justified in this case, where the Report relies on data from 1993, and devotes only a single paragraph to the topic of "documentation." At this juncture, however, it would be unduly speculative for us to address the question whether this country report alone could justify a refusal to give any weight to the documents at issue in this case. Until we know whether and, if so, to what degree the country report figured in the IJ's evaluation of the evidence, consideration of that issue is plainly premature.

V.

For these reasons, we hold that the order of the BIA must be vacated and the case must be remanded. See Liu, 372 F.3d at 534; Abdulai v. Ashcroft, 239 F.3d 542, 555 (3d Cir. 2001) (remanding "[b]ecause the BIA's failure of explanation makes it impossible for us to review its rationale"). The "BIA may proceed on remand as it does with respect to any evidentiary question, evaluating issues of materiality, relevance, probity, and the general requirements of due process." Id. at 534 n.9 (citations omitted). See also Yongo v. INS, 355 F.3d 27, 30-31 (1st Cir. 2004) (enumerating methods of authentication). If it determines that the documents were excluded, it must explain the basis for exclusion. If it decides that they were admitted, it must square them with the IJ's decision.

McKee, Circuit Judge concurring

I fully join my colleagues' opinion. However, I write separately to express my concern with the Immigration Judge's reasoning in this matter. I am particularly troubled because the Immigration Judge ignored evidence corroborating Zhang's claim while apparently going out of his way to find problems with it. Consequently, as I shall explain, the IJ's opinion reads like "a progression of flawed sound bites that gives the impression that [the IJ] was looking for ways" to deny Zhang's claim, rather than adjudicate it. *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003).

12

The IJ states that Zhang's testimony:

> right at the beginning, appears to be a script. This is subtle but it's an indication of what was to follow. I'm referring to when the respondent, in her oral testimony, stated right at the outset, 'I have suffered persecution from the family planning.' . . . real refugees are not throwing around the word 'persecution' that often . . . In the cases where the persecution is lacking because the story is not true the word 'persecution' tends to be used more and more.

App. 13. The IJ's reaction to this testimony, by his own account, seems to have predisposed him "right at the beginning" to conclude that Zhang was not being truthful. Given the evidence supporting her claim, absent some explanation, that reaction is simply unsupportable.

Zhang used the word "persecution" exactly once during her entire testimony. She did not "throw[] around the word . . . that often . . .". The single instance in which she referred to "persecution" is as follows:

> **Question**: Why did you leave China?
> **Answer**: Because I have suffered persecution by the family planning.
> **Question**: Can you describe what family planning is?
> **Answer**: They just forced me to undergo abortion and have the IUD inserted, but I do not go willingly.

App. 62, lines 12-17. Based upon that one reference to "persecution," the IJ concluded "right from the beginning" that Zhang was being untruthful. He thereafter viewed her claim through jaundiced eyes despite substantial documentary evidence that corroborated it.

Zhang's reference to "persecution"is hardly remarkable even if that word is not part of her daily vocabulary. Zhang may well have become familiar with that word and learned its relevance

13

to her claim during the course of the hearings into the issue of "persecution." Zhang was, after all, represented by an attorney who would have discussed her case with her before the hearing.[9] She could easily have realized that the treatment she was describing was tantamount to "persecution" under our immigration laws. However, for reasons that are not apparent on this record, the IJ never allowed for that possibility.

Although we don't expect an Immigration Judge to search for ways to sustain an alien's testimony, neither do we expect the judge to search for ways to undermine and belittle it. If the IJ's reference to Zhang's single use of "persecution" were the only troubling aspect of his opinion, it could be dismissed as hyperbole. However, the rest of the IJ's opinion is also troubling.

The IJ believed it was implausible that a woman as "relatively humble and who [has as] little education" as Zhang would be familiar with the Chinese government's mistreatment of those Chinese citizens that return to China after leaving for the United States. App. 13-14. However, the IJ never bothered to explain why he discounted the very real possibility that someone in Zhang's position could learn her government's policies through "word of mouth." Indeed, given the absence of a free press so typical of authoritarian regimes, information about official mistreatment of citizens would more likely spread by word of mouth than written word. Yet, the IJ concluded, without citing any supporting evidence, that Zhang "came about this 'knowledge' because someone, probably the smuggler or someone who arranged for her to come forward with this asylum, told her to throw that one in." *See* app. 13-14. That is nothing short of rank speculation.

The IJ assumed that Zhang manufactured a "dramatis personae" [sic] in testifying about the doctor who removed IUDs because he was purportedly able to remove them and avoid prosecution by the authorities. The IJ was skeptical that residents in her community knew the doctor's identity, yet the identity

---

[9] It would have certainly been less than professional to call his client as a witness without discussing the case with her beforehand.

14

remained hidden to the authorities. The IJ reasoned:

> According to the respondent "a lot of people knew about" this doctor who was taking IUD's out in the particular area of China. Apparently, no one in the planning office knew about this doctor. Everybody else knew about him but the people who count, the officials, didn't seem to know that as they were putting IUD's into women he was down the street taking them all out. One could just imagine what kind of punishment a person like that would suffer if the rest of these allegations about the severity of the birth control policies in China are to be believed.

App. 15.

Once again, given the evidence corroborating Zhang's claim, his skepticism of that testimony is as unfounded as it is naïve. The IJ's reasoning proceeds as follows: Zhang said she and others knew of a doctor who was illegally removing IUDs. The doctor had not been arrested even though villagers knew what he was doing. Therefore, the doctor must not exist and Zhang must have manufactured him for her testimony.

Of course, the IJ had no way of knowing whether the doctor was eventually prosecuted. Moreover, it is not that improbable that a doctor could perform illegal procedures and not be arrested. Even in a society as advanced as our own, not every "law breaker" is arrested. One need only recall that a few years ago, women in the United States were able to find doctors willing to perform abortions even though the practice was then illegal.

Today we need look no further than many American cities where open air drug markets prosper even though residents, and even police, know drugs are being sold there. For example, in *United States v. Miller*, 73 F. Supp. 2d. 4, 6 (D.C. Cir. 1999), the court refers to the Drug Enforcement Agency refusing to renew a lease on a property because of nearby open air drug markets. The court explained: "This property . . . is an older building . . . At one point the Drug Enforcement Administration was the tenant. Ironically, the DEA did not renew the lease because of narcotic

15

activity in open air drug markets in the area." *Cf. United States v. Edmonds*, 240 F.3d 55, 57 (D.C. Cir. 2001) ("The officers included . . . a 21-year veteran who had worked in that neighborhood intermittently for some 14 years. [It] is notorious as one of the many 'open air drug markets' infesting the nation's capital . . ."); *United States v. Baptiste*, 264 F.3d 578, 581 (5th Cir. 2001) ("The government presented evidence at trial that an 'open air drug market' existed in the Seventh Ward beginning in the early 1990s."); *United States v. Gibbs*, 904 F.2d 52, 60 (D.C.Cir. 1990) (counsel objected when the witness testified the defendant was "up around J. street, the open air drug market"). According to the logic that was used to deny Zhang's claim, these open air drug markets simply do not exist because officials would know about them.

There is, however, an even more troubling aspect of the Immigration Judge's decision. Given the judge's analysis, I can not help but wonder if his decision here was influenced by his view of Zhang's parenting. The Judge stated:

> So she has three children. This is like a bird in the hand versus two in the bush. To [Zhang] two in the bush is more important than the one in the hand. She has three children which she can take care of, which she can cherish and be part of their upbringing, or she could say, "No. I'm not really interested in that. What I think I'll do is I'll just discard those three kids and I'll worry about some other kids who may in the future materialize somehow or other. I'm not quite sure how because, by the way, my husband happens to be in China as I sit here and speak. But let's forget about the kids that I have and we'll worry about the kids that I don't have and in all probability never will have."

App. 18.

In fairness, it is possible that the IJ summarized Zhang's testimony in this manner to explain why he found her asylum claim inconsistent with her leaving her three children in China, and that this undermined her credibility. However, given the Judge's

16

willingness to ignore so much of this record that is consistent with Zhang's testimony, I can not help but be concerned that such a bias played a role in this decision. The issue before the Judge was, after all, whether Zhang qualified as a "refugee," not the quality of her parenting, or her presence in the home. *See Perez-Alvarez v. INS*, 857 F.2d 23, 24 (1st Cir. 1988) (in considering claims of persecution it is "highly advisable to avoid assumptions regarding the way other societies operate.").

In overlooking the evidence corroborating Zhang's testimony, the IJ explained: "[w]hen someone is going to come in and say they had a forcible abortion . . . I'm going to want some proof that it's more than just possible, that there is a substantial chance that this thing . . . happened. . . ." App. 17. Though he demanded "some proof," the judge totally ignored proof that Zhang had introduced to corroborate her claim. This included (1) birth certificates for Zhang, her husband, and her three children; (2) a receipt indicating that Zhang was fined 3000 Yuan for removing an IUD without permission; (3) another receipt showing that Zhang was fined 5000 Yuan for "attempt to give birth secretly;" (4) a Birth Control Surgery Certificate from Changle City stating that Zhang "was conducted with a Abortion Operation and IUD installation on March 15[, 1996] at our Clinic;" and (5) a notice addressed to Zhang and her husband from the "Birth Control Office of Shouzhan Town Changle City," which instructed Zhang or her husband to go to the local hospital to be sterilized, or, be forced to be sterilized, because Zhang already had children.

The IJ also rejected Zhang's testimony that her IUD fell out without relying on any medical or scientific evidence. He simply concluded that IUDs cannot fall out without an individual noticing. App. 19. There are, however, sources that indicate that this is a d i s t i n c t   p o s s i b i l i t y .   *S e e :* http://www.plannedparenthood.org/pp2/portal/files/portal/medic alinfo/birthcontrol/pub-contraception-iud.xml.[10] ( "Although uncommon, an IUD can be expelled without your knowing it. This is most likely to happen during your period. It is a good idea to check your pads or tampons daily while you are menstruating to see if the IUD has fallen out.").

_____

[10] Last viewed March 17, 2005.

Finally, the IJ explains that he is skeptical about Zhang's testimony that only farmers are allowed to have a second child because "[t]here is no support for that anywhere in what the State Department tells us." App. 17. However, there is nothing in the State Department Report that undermines that testimony either. Zhang can not be faulted because the State Department Country Report fails to touch upon every aspect of China's one child policy. Moreover, common sense would suggest that, to the extent that an authoritarian regime is supported by an agrarian economy, officials might well allow farmers more than one child to help with the land, but deny that permission to families that did not need the extra labor to produce food. Frankly, I do not know if this is true or not. I submit, however, that it is consistent with common sense and I mention the possibility only to illustrate that the IJ seems to have gone out of his way to find Zhang's testimony incredible.

Thus, I think it important to state that if the BIA remands this matter for further proceedings before an Immigration Judge, I hope that the Bureau will see the wisdom of referring it to a different IJ. This IJ's decision was "not based on a specific, cogent reason, but, instead, [] based on speculation, conjecture, or an otherwise unsupported personal opinion." *Dia*, 353 F.3d at 250. Accordingly, I do not see how Zhang can receive a hearing that would insure the fairness and the appearance of impartiality so crucial to a just result if the case is ultimately decided by the same IJ. As the Supreme Court observed in *Offutt v. U.S.*, 348 U.S. 11, 14 (1954), to perform its high function in the best way, "justice must satisfy the appearance of justice." In order to achieve that result here, Zhang must have a hearing before a different Immigration Judge.[11]

---

[11] The importance of remanding Zhang's case to a different Immigration Judge is further demonstrated by yet another excerpt from the IJ's oral decision. In an apparent attempt at sarcasm, and despite documentary corroboration that Zhang had undergone a forced abortion, the judge quipped, "[t]here is evidence [that forced abortions] have occurred but there is also evidence that meteors have landed in the United States." App. 17.

I have no idea what the judge meant by that comment. Meteors have, after all, fallen in the United States, and I don't understand how that fact undermines proof of their existence, nor why it is relevant to Zhang's corroborated claims.