

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-4-2009

# Millien v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-1042

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Millien v. Atty Gen USA" (2009). *2009 Decisions*. Paper 1242.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1242

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-1042
_____

FRANKEL MILLIEN,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent

_____

On Petition for Review of an Order
of the Board of Immigration Appeals
Agency No. A079 466 332
Immigration Judge: Frederic G. Leeds

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 2, 2009
Before: MCKEE, HARDIMAN and ROTH, Circuit Judges

(Opinion filed: June 4, 2009)

_____

OPINION
_____

PER CURIAM

    Frankel Millien petitions for review of an order of the Board of Immigration

Appeals (BIA), which dismissed his appeal of an Immigration Judge's (IJ's) final

removal order.  We will grant the petition and remand for further proceedings.

I.

Millien is a native and citizen of Haiti. Millien conceded that he was removable for entering the United States without inspection or parole, but applied for asylum and related relief. Millien's application was based on his fear of being persecuted because of his political involvement in Haiti.[1] Millien testified that he became involved with the "OPL" political party (translated in the hearing as "Organization of People in Fight") in 1999. A.R. 123-24. The OPL party was opposed to the Lavalas party that was in power. Millien testified that he was a "mandator" in the party, which involved inviting people to political meetings. A.R. 125. Millien was also involved in the campaign of party candidate Paul Denis, in preparation for the May 25, 2000 elections. Millien's attorney, who had earlier noted that he was fluent in Haitian Creole, see A.R. 61; informed the Court that he believed the translation "mandator" was literal, and that the word could be translated as something like "agent," that the party had given you the authority to do something. A.R. 132. The IJ then stated to Millien, "Okay, so you were a leader–"; Millien's attorney interposed, "Just an agent, Your Honor." A.R. 132-33. However, the IJ then said to Millien, "So you were one of the leaders in the campaign?" and Millien

_____

[1] Millien testified first before IJ William Strasser on August 22, 2005. Judge Strasser adjourned the proceeding to allow Millien to obtain evidence in support of his claims. The matter was then apparently reassigned to IJ Frederic Leeds, who decided to proceed from the beginning, and heard Millien's testimony on June 9, 2006. Judge Leeds apparently listened to the tape of the testimony before Judge Strasser. A.R. 106. We may occasionally refer to Millien's testimony before Judge Strasser, which is found at A.R. 51-102.

2

agreed.  A.R. 133.

Millien testified that between January 2000 and the time of the election, he had been "qualified as someone who was plotting against the Lavalas government."  A.R. 133-34.  When he was passing out literature people would go by and say "oh, you're the ones plotting against the Lavalas government."  A.R. 134.  He also received anonymous threatening phone calls, indicating that he was plotting against the government, and that he would be taken away.  Millien was aware that in the past, Lavalas had taken people away and they disappeared or were found dead on the streets.  A.R. 135.  Millien believed he received about six such calls, but he knew there were other calls answered by his father and mother, and he could not estimate how many times his parents answered such calls.  A.R. 136.

On June 15, 2000, Millien was at a political meeting of about 60-70 people to invite them to a demonstration regarding fraud committed during the May 21, 2000 election.  A.R. 137.  Some people entered the meeting and asked for him.  They took him, telling him that he was plotting against Lavalas and that they were taking him away.  A.R. 138-39.  They handcuffed him and put him inside a van.  While they were putting him in the van, they pushed him to the floor of the van and he hit his head, but it was not serious. A.R. 138-39.  They closed the door, and returned to the hall to get the people to stop making noise.  A.R. 138.  Millien discovered that the van door was not locked, and he got out and went to a friend's house.  He left his friend's the next morning and took public

transportation to his uncle's home. A.R. 140-41. He told his uncle what had happened, but did not report it to the police, because he believed Lavalas was operating inside the police. A.R. 141.

On June 20, 2000, a group of people went to his parents' home and asked for him. His father said he did not know where his son was. The people started beating them, ransacked everything in the house, and set fire to a small house where Millien used to sleep and keep his political papers. His parents went to the police the next day and made a report. He believed his parents were able to go to the police because Lavalas was not looking for them, and they did not know where their son was. A.R. 142. Millien learned about the incident with his parents when his uncle went to check on them on June 25, 2000. When his uncle returned, he told Millien about the incident. A.R. 143.

The IJ made a negative credibility finding based on the following: (1) Millien testified he was in a leadership position, but his asylum applications[2] only indicate that he was a member of the party; (2) his asylum applications state that he was "mistreated and beaten up," but he testified that he did not sustain injuries that required medical care; (3) he did not mention being handcuffed and put in a van in his asylum applications; (4) his father's statements to the police do not indicate that Millien's parents were beaten, but both asylum applications mention his parents being beaten; and (5) there was a "serious

_____

[2] Millien initially submitted an asylum application in April 2001. See A.R. 249-59. Millien submitted an amended application in 2005. A.R. 240-48.

4

inconsistency" between Millien's application (indicating 50 phone calls) and his testimony regarding the number of telephone threats he had received. A.R. 20-22. The IJ found that Millien had not met his burden of showing past persecution, and was therefore not entitled to a rebuttable presumption that he would be persecuted in the future. See 8 C.F.R. § 1208.13(b)(1)(i). The IJ further found that Millien had not met his burden of showing that he would be persecuted in the future, given indications in the country reports that Millien's political party had been able to engage in elections, and given a lack of evidence that violent groups of Lavalas were currently causing problems in Haiti. A.R. 26-27. The IJ found that Millien did not meet the higher burden of showing eligibility for withholding of removal, and noted a lack of evidence that it was more likely than not that Millien would be tortured if he returned to Haiti. A.R. 28-30.

In a one-paragraph decision, the BIA indicated that it was "not persuaded by [Millien's] arguments on appeal, that the factual findings, including the adverse credibility finding in this case, were clearly erroneous, or that the [IJ's] decision was otherwise in error." A.R. 2. Millien filed a timely, pro se petition for review in this Court.

We review the final order of the BIA, but to the extent that the BIA adopts parts of the IJ's opinion, we review the IJ's opinion to determine whether the BIA's decision to defer to the IJ was appropriate. Zhang v. Gonzales, 405 F.3d 150, 155 (3d Cir. 2005). "We will uphold the [adverse credibility] findings . . . to the extent that they are supported

5

by reasonable, substantial and probative evidence on the record considered as a whole, and will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the [IJ] did." Kayembe v. Ashcroft, 334 F.3d 231, 234 (3d Cir. 2003). In general, "minor inconsistencies and minor admissions that reveal nothing about an . . . applicant's fear for his safety are not an adequate basis for an adverse credibility finding." Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Any discrepancies must involve the heart of the claim. Id.[3]

We find that the IJ's credibility finding is not supported by substantial evidence. First, the IJ found Millien's testimony that he was a "leader" of his party to be inconsistent with his applications, which mention that he was a "member" of the party. Millien's first asylum application indicates that he worked "with a Senator during his campaign for may [sic] election . . . ." A.R. 258. The second application does not explicitly mention his party membership, but notes that he was threatened and beaten by a pro-Lavalas group. A.R. 244. An adverse credibility finding should not be made solely on the basis of an asylum application that is not as complete as desired, particularly where the alien subsequently provides documentation consistent with his testimony. Hamida v.

---

[3] The Real ID Act of 2005 created a new INA § 208(b)(1)(B) [8 U.S.C. § 1158(b)(1)(B)] that apparently requires us to give even greater deference to an IJ's credibility determinations, even to determinations relying on inconsistencies and omissions that do *not* go "to the heart of" an alien's claims. Whatever the impact of this new provision, however, it does not apply to cases such as this one, where the asylum application was filed long before the enactment of the Real ID Act. Real ID Act of 2005, Pub. L. No. 109-13, Div. B, § 101, 119 Stat. 231 (May 11, 2005).

Gonzales, 478 F.3d 734, 739 (6th Cir. 2007); Aguilera-Cota v. I.N.S., 914 F.2d 1375, 1382-83 (9th Cir. 1990). Here, Millien testified that he was a "mandator" and worked with a senator in preparation for the May 2000 elections. Millien provided a copy of his party membership card, A.R. 238-39; and also a document from the party, dated January 3, 2000, A.R. 293-94, which states that Millien had been ordered to represent the party by enrolling voters in the Second Circumscription of Aquin (apparently a political district), by establishing a "Bureau" there, and by controlling and overseeing all phases of voting there. Neither the IJ nor the Government questioned these documents.[4] It is true that his asylum applications do not give the details of his party involvement, but Millien's testimony is consistent with the documents he produced.

The IJ next questioned the fact that Millien's applications state that he was "beaten" during the January 15, 2000 incident, but that he testified that he only hit his head and it was not serious. "If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." Sylla v. I.N.S., 388 F.3d 924, 926 (6th Cir. 2004). Here, Millien's testimony was not an attempt to enhance his claim; rather, he downplayed the injury he received. Further, his testimony is consistent with a statement he produced from witnesses, who stated that Lavalas agents broke into the meeting on June 15, 2000, accused Millien of plotting

---

[4] The Government did ask about whether the membership card was his most recent. Millien acknowledged that he had renewed his membership in 2000, but that the more recent card was destroyed when his house was burned. A.R. 149.

7

against the Lavalas government, and forced him into a van in handcuffs. A.R. 223-26. Again, neither the IJ nor the Government questioned this document. Relatedly, the IJ was concerned because Millien had not mentioned in his asylum application that he had been handcuffed and put in a van. However, as noted, Millien's testimony was consistent with the documentary evidence.

The IJ also found problematic that Millien stated in his asylum applications that his parents had been beaten in the June 20, 2000 incident, but that Millien's parents' statements to the police do not mention that they had been beaten. However, Millien explained that he was not present during the June 20th incident, and that it was his uncle who told him that his mother and father said they had been beaten. A.R. 176. Indeed, the statement from Millien's uncle states that Millien's mother and father were beaten, A.R. 220-22; thus, it is reasonable to infer that Millien was just repeating what his uncle told him. Further, the statement from his father, made just a day after the June 20th incident, clearly indicates that the police found the gates to the home were broken, "all the effects of the house [were] scattered and crowded on the ground, the furniture are broken everywhere, the beds and mattresses are broken," and that the "house that he was living [sic] was burned." A.R. 226. When questioned, Millien's father indicated that the night before:

> some armed individuals have penetrated by breaking at the interior of the house, while asking for the presence of my son FRANCKEL MILLIEN. Fortunately he didn't sleep in the house that night; he would have been killed because the bandits in breaking the effects of the house were very

8

> furious in mentioning the name of my son FRANCKEL MILLIEN. Making
> to believe that they needed him to kill [sic] under pretext that he didn't
> work in favor of the politics "LAVALAS" to the elections of May 2000.

A.R. 226-27. This document is consistent with Millien's testimony that he was pursued by Lavalas members. Neither the IJ nor the Government questioned the authenticity of this document.

The IJ's final concern was regarding the number of threatening telephone calls Millien received. There is a clear discrepancy between his testimony of receiving six calls and his application which states 50. When questioned about the discrepancy, he argued that he was unaware of how many calls his parents received, and the number "50" may have appeared on the application due to an error in translation. A.R. 178-80. Millien assured the Court that his testimony at the hearing was truthful. A.R. 181. Although we agree that there is a discrepancy, Millien's testimony of receiving only six phone calls could not be viewed as an attempt to enhance his claims of persecution.

We find that the IJ's adverse credibility finding is not supported by substantial evidence. We are particularly concerned that the IJ did not make any attempt to reconcile the adverse credibility finding with the documentary evidence. Assuming Millien is credible, he has established that he received threats from an opposing political party, that members of that party attempted to kidnap him, and that when he escaped, the opposing party members ransacked his parents' home and burned his home. We hold that Millien has established past persecution on the basis of his political opinion. He should  therefore

9

be given a the benefit of a rebuttable presumption that he would be persecuted in the future. The Government may attempt to rebut the presumption of future persecution on remand, if it so chooses.

We will grant the petition for review and remand this matter to the Board of Immigration Appeals for further proceedings consistent with this opinion. See I.N.S. v. Ventura, 537 U.S. 12, 17 (2002) (per curiam).[5]

---

[5] Given the remand, we do not reach the issue of whether Millien has met his burden of showing that he is eligible for withholding of removal or protection under the Convention Against Torture.