

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-26-2004

# Chen v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-2155

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Chen v. Atty Gen USA" (2004). *2004 Decisions.* Paper 430.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/430

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 03-2155

HE CHUN CHEN,
a/k/a
HE ZHONG CHEN

v.

JOHN ASHCROFT, Attorney General
of the United States,

Respondent

He Chun Chen,

Petitioner

On Petition for Review of an Order of
the Board of Immigration Appeals
(INS File Nos. A77-297-487)

Argued June 28, 2004

BEFORE: AMBRO, BECKER, and
GREENBERG, Circuit Judges

(Filed: July 26, 2004)

Bruno J. Bembi (argued)
62 Nichols Court
Suite 202
Hempstead, NY 11550

Attorney for Petitioner

Peter D. Keisler
Assistant Attorney General
Civil Division
Earle B. Wilson
Douglas E. Ginsburg
John D. Williams
Terri J. Scadron
Joshua E. Braunstein (argued)
Efthimia S. Pilitsis
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Attorneys for Respondent

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on He Chun Chen's petition for review of a decision of the Board of Immigration Appeals ("BIA") dismissing his appeal from an order of an Immigration Judge ("IJ") denying his application for asylum and withholding of removal or in the alternative for protection under the Convention Against Torture. Inasmuch as

we find that substantial evidence in the record supports the findings of both the IJ and the BIA, we will deny the petition.


## II.  FACTUAL AND PROCEDURAL HISTORY

Chen, a native and citizen of the People's Republic of China, arrived in the United States at Los Angeles International Airport on December 23, 1999, and applied for admission without valid entry documents.  On February 22, 2000, the Immigration and Naturalization Service ("INS"), whose functions since have been transferred to the Department of Homeland Security, initiated removal proceedings against Chen by serving him with a notice to appear.  At a hearing before an IJ in which he was represented by counsel, Chen conceded removability but indicated that he intended to seek political asylum, withholding of deportation, and protection under the Convention Against Torture.  Chen predicates his claims on allegations that Chinese authorities forced his wife to terminate two pregnancies and caused her to be sterilized forcibly in accordance with the coercive family planning practices of the Chinese government.  He also alleges that the Chinese authorities ransacked and closed his bookstore because he sold Falun Gong literature.

In recognition of the circumstance that the IJ and the BIA premised their denial of his application on Chen's lack of credibility, we will recount his testimony in detail.  Chen testified at an October 4, 2000 hearing before the IJ that he is from Fuzhou City in the Fujian Province of China, where he graduated from high school in 1981.  From 1981 through 1996 Chen worked in construction and in 1996 he opened a bookstore.  Chen married Ha Yun Ni on October 27, 1994, who, on August 20, 1995, gave birth to a daughter.  One month later the government family planning authorities took his wife to Guan Tou Hospital for insertion of an intra-uterine device ("IUD") to prevent pregnancy.  According to Chen, the family planning regulations required the insertion of an IUD after the birth of a child but, after four years, permit a family to request permission to have another child.

Chen testified that the IUD must have failed because in early 1996 his wife discovered that she was pregnant.  According to Chen, the family planning authorities required his wife once every three months to go for "inspections" to check on her IUD and ensure that she was not pregnant.  When Chen's wife did not go for the scheduled inspection of her IUD by the authorities, they came on April 26, 1996, to the family home to find her.  At that time Chen was at his bookstore.  When he returned home that night his wife told him that the authorities had taken her to Lian Jiang Hospital and forced her to undergo an abortion against her will.  Chen said that while his wife did not tell him about the procedure in detail, she did mention that she was given a shot. On the same day as the abortion the authorities also forced her to have another IUD

2

inserted.

Chen testified that in 1998 he petitioned for permission to have a second child. The authorities denied this request, citing the earlier violation of the family planning policy. Unbeknownst to the Chinese government, he and his wife then decided to elicit the assistance of a private physician to remove the IUD, and in April 1998 Chen's wife had the IUD removed. One month later in May 1998 Chen's wife discovered that she was pregnant again. When the authorities notified her that it was time for an inspection of the IUD in July, Chen's wife went into hiding at her parents' house in Guan Tou. On August 31, 1998, the authorities found Chen's wife at her parents' home and took her to Lian Jiang Hospital for another forced abortion. As with the first abortion, Chen's wife was given a shot. The authorities also inserted another IUD on the same day. The following year Chen again submitted a request to the Chinese government to have another child but this time the authorities granted the request. In October 1999 Chen's wife discovered that she was pregnant.

Chen also testified before the IJ that he sold Falun Gong books by Li Hong Zhi in his bookstore from April 1996 through April 1999, when the Chinese government destroyed and closed the store. Government cadres came to his store and notified him that he no longer could sell Falun Gong books. According to Chen, the government officials explained that Falun Gong was an evil religion.

Nevertheless, even though he was warned not to sell the Falun Gong books, Chen continued to do so because it was profitable. Chen testified that he received a second warning that he should cease all sales of Falun Gong materials. Chen, however, informed an immigration officer in California in February 2000 that the Chinese government gave him "a" warning about selling Falun Gong books. AR[1] at 199-200.

Chen testified that he was not a member of Falun Gong, but only sold its books, though at the airport interview conducted on the day of his arrival in the United States, Chen told an immigration official that he was a practitioner of Falun Gong. When asked by the IJ why he made this statement even though it was not true, Chen responded that "[t]he smuggler taught me to say that, they said that I have to say that. They said, they told me not to say anything else, just say I am a Falun Gong follower." AR at 202. Chen, however, never mentioned anything at his airport interview about his family's difficulties with the family planning policies in China.

Chen testified that when he refused to heed the cadres' warnings, the Chinese authorities in May 1999 confiscated his books, destroyed the bookstore, and closed it down. Chen then went into hiding. He testified that he stayed with an uncle in

---

[1]We cite the administrative record as AR.

3

Changle City until November 1999, though in an earlier interview with United States immigration authorities Chen stated that he stayed with a relative until September 1999. When confronted with this inconsistency during the immigration hearing Chen responded "[m]aybe I made a mistake?" AR at 200.

Two months later on December 21, 1999, Chen left China with the assistance of "snakeheads." Chen traveled to Hong Kong, then to Jakarta, Indonesia, on to Malaysia and finally to Los Angeles. Chen testified that he left China because he knew that if his wife gave birth to a son, she definitely would be sterilized. He explained that his wife did not come to the United States because she was pregnant and not feeling well.

On July 13, 2000, Chen's wife gave birth to a son. Two months later, on September 6, 2000, the Chinese authorities sterilized his wife. Inasmuch as Chen was in the United States when his wife was sterilized, he obtained the information that he provided at the hearing about the sterilization from her. In this regard the IJ questioned Chen why his wife would be sterilized inasmuch as he was already in the United States and therefore there seemed little risk of pregnancy. Chen responded that "[t]hey don't care, as long as you gave birth to two, two children, and then they don't care, either the male or the female must be sterilized." AR at 173.

According to Chen, his wife stayed at her mother's home after he left China,

but she had to return to their home because it was the anniversary of the death of Chen's mother. Chen testified that the authorities found his wife at their home and brought her to Mawei Hospital for the sterilization. A letter submitted by Chen from his wife states, however, that the family planning officials found her at her parents' home and took her for the sterilization from there.

Chen testified that he was applying for political asylum because he violated China's family planning policies and sold Falun Gong books in his bookstore. He indicated that he feared returning to China because he might be sterilized. When the IJ asked why the authorities would sterilize him inasmuch as his wife already had been sterilized, he stated that he would not be sterilized and had "made a mistake." AR at 185.

At the conclusion of the hearing, the IJ issued an oral decision denying Chen relief. In particular, the IJ found that Chen failed to establish a well-founded fear of persecution, a necessary showing for him to be eligible for asylum. Therefore, the IJ found that it was not necessary to consider whether Chen was eligible for relief as a matter of discretion. The IJ also denied Chen's application for withholding of removal and found that Chen had not shown that more likely than not he would be tortured if he returned to China, and, accordingly, he did not merit protection under the Convention Against Torture.

4

In reaching his conclusions, the IJ found that Chen's testimony lacked credibility in several respects. First, the IJ explained that he found Chen's testimony that on two occasions his wife had an IUD inserted on the same day she had an abortion as "not only incredible but also implausible." The IJ reasoned that "due to the physical trauma of an abortion, the Court finds that it is unlikely and most likely physically impossible to insert an IUD in an individual who has earlier that day suffered an abortion." AR at 97.

Moreover, the IJ questioned Chen's testimony regarding his wife's sterilization. He stated that "[t]his line of testimony again is not credible to the Court and the Court does not understand why the authorities would wish to sterilize the respondent's wife since the respondent, himself, was in the United States." AR at 98. In addition, the IJ identified an inconsistency in Chen's recounting of his wife's sterilization. Chen testified that the authorities found his wife at their home, while Chen's wife's letter indicated that the authorities located her at her parents' home. The IJ also pointed out that Chen contradicted himself during his testimony regarding his fear of sterilization. Thus, while Chen first testified that he feared that if he returned to China he would be sterilized, when the IJ asked why the authorities would sterilize him inasmuch as they already had his wife sterilized, he responded that he would not be sterilized and had made a mistake.

The IJ also questioned Chen's testimony as to the timing of his departure from China. Chen testified that he left China after he and his wife had received permission to have a second child and while his wife was pregnant. The IJ stated:

> It makes absolutely no sense to the Court that if the respondent and his wife were granted permission to have another child, that the government would be considering sterilizing either the respondent or his wife. Thus, it makes absolutely no sense to the Court and it is implausible testimony that the respondent would wish to leave China due to the family planning policy after he had received permission to have this second child.

AR at 100-01. The IJ also pointed to the discrepancy in Chen's testimony regarding the length of time he stayed at his uncle's home in Changle City while he was in hiding prior to leaving for the United States. At the hearing Chen testified that he lived with his uncle until November 1999 while he previously had informed an immigration official that he stayed with a relative only until September 1999.

The IJ also indicated that Chen's testimony relating to his bookstore lacked credibility. Chen testified that government officials warned him twice that he should discontinue selling Falun Gong books.

5

However, the IJ pointed out that at an earlier interview with an immigration official Chen stated that he only had been given "a" warning.

Furthermore, the IJ emphasized that while Chen testified that he was not a member of Falun Gong, at his airport interview he informed the immigration officer that he was in fact a member. Chen explained during his testimony that the smugglers had told him to say this. The IJ also noted that Chen never mentioned anything during his airport interview about any difficulties his family had with China's family planning policies. The IJ explained that Chen was alone with the immigration official at the airport, and, therefore, "[n]otwithstanding what the snakeheads had told him to say, I see no reason why the respondent would not tell the inspector the truth, and why his testimony would not coincide with the testimony given to the Court today, specifically concerning the problems that his wife has experienced." AR at 103.

Overall, after considering the entire record before him, the IJ concluded that Chen had "not established, due to his lack of credibility a well-founded fear of persecution if he were returned to China. Accordingly, his application for asylum will be denied." AR at 104. The IJ also denied Chen's application for withholding of removal and for protection under the Convention Against Torture. Thus, the IJ entered orders denying Chen any relief.

Chen appealed from this disposition to the BIA. On April 3, 2003, the BIA issued its decision dismissing Chen's appeal. In support of its decision, the BIA cited the numerous inconsistencies pointed out by the IJ. The BIA noted the discrepancy between Chen's wife's account of where she had been when she was taken for sterilization and Chen's testimony before the IJ. The BIA further found that Chen failed to sustain his burden of proof in showing that his wife was subjected to two forced abortions. While it recognized that Chen submitted two abortion certificates, it questioned their validity, citing the Department of State country report which states that "such purported certificates, if they exist at all, may be documents issued to women who voluntarily submit to an abortion and are entitled to the resulting benefits." AR at 2. The BIA also explained that Chen had failed to prove a well-founded fear of persecution on account of China's coercive family practices because he recognized that he would not face sterilization if he returned to China.

The BIA found that the record supported an adverse credibility determination as to Chen's claim related to his sale of Falun Gong books. It pointed to the discrepancy in Chen's account as to how many times he was warned to stop selling the books prior to the Chinese officials closing down his shop. AR at 2. The BIA further cited the false story that Chen gave at the airport that he was a follower of Falun Gong. It noted that Chen did not support this aspect of his claim with "objective evidence that a bookstore owner may have acquired over

the years to corroborate his claim that he owned a bookstore and that the bookstore was closed." AR at 3. The BIA concluded that "[f]or those reasons and others cited in the Immigration Judge's decision, the Immigration Judge correctly denied the respondent's application for asylum and withholding of removal." AR at 3. The BIA also upheld the IJ's determination with respect to Chen's application for protection under the Convention Against Torture. Consequently, it dismissed his appeal.

Chen timely filed this petition for review, limiting his arguments to his asylum and withholding of removal claims, thus abandoning his claim for protection under the Convention Against Torture.

## III. JURISDICTION AND SCOPE OF AND STANDARD OF REVIEW

The BIA had jurisdiction over this matter pursuant to 8 C.F.R. § 3.1(b)(3) (2002), now 8 C.F.R. § 1003.1(b)(3), which grants it appellate jurisdiction over decisions of immigration judges in removal cases. We have exclusive jurisdiction under section 242(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a)(1), to review final orders of removal.

We review adverse credibility determinations for substantial evidence. Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998). Under this deferential standard of review, we must uphold the credibility determination of the BIA or IJ unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Accordingly, we are required to sustain an adverse credibility determination "unless . . . no reasonable person" would have found the applicant incredible. See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623, 113 S.Ct. 2264, 2280 (1993). For Chen to prevail, the evidence of credibility must be so strong in his favor that in a civil trial he would be entitled to judgment on the credibility issue as a matter of law. See INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1, 112 S.Ct. 812, 815 n.1 (1992) (holding that the BIA's decision can be reversed only where the petitioner's evidence "compels" a reasonable factfinder to find in his or her favor). However, adverse credibility determinations "based on speculation or conjecture, rather than on evidence in the record, are reversible." Dia v. Ashcroft, 353 F.3d 228, 249 (2003) (en banc) (quoting Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002)).

In addition to setting forth our standard of review we must determine its scope, i.e. does our appellate jurisdiction encompass review of the IJ's decision as well as the BIA's order? We recently have recognized that when the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA. Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004); see also

Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001) ("When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate."). Where the BIA substantially relies on an IJ's adverse credibility determination, we must look to both decisions in order to satisfy our obligation under 8 U.S.C. § 1252(b) to review the administrative decision meaningfully. Xie, 359 F.3d at 242; see also Dia, 353 F.3d at 243.

The BIA's decision in this case makes clear that it was relying upon the adverse credibility finding made by the IJ. While the BIA identified some of the inconsistencies the IJ cited, it did so by way of example and did not conduct a de novo review of the record to arrive independently at its conclusions. Inasmuch as the BIA deferred to the IJ's credibility determinations and adopted the reasons the IJ set forth, we have authority to review both determinations.

## IV. DISCUSSION

The framework in which we review the administrative determinations is well established. Section 208(a) of the INA, 8 U.S.C. § 1158(b), gives the Attorney General discretion to grant asylum to any alien who demonstrates that he or she is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). Elias-Zacarias, 502 U.S. at 481, 112 S.Ct. at 815. To qualify as a "refugee," one must demonstrate that he or she is "unable or unwilling to return to . . . that country [of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The definition of "refugee" includes "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization" under the ambit of persecution "on account of political opinion." Id. § 1101(a)(42)(B). The BIA has extended this protection to include the spouse of an individual who has been sterilized or otherwise subject to a coercive population control program as defined by 8 U.S.C. § 1101(a)(42)(B) and we decide this appeal assuming the validity of that conclusion. In re C-Y-Z, 21 I. & N. Dec. 915, 918 (BIA 1997). In that case the BIA found that a husband could "stand in [the] shoes" of a wife who had been sterilized forcibly and therefore was eligible for asylum on that basis. Id.[2]

---

[2]This case demonstrates what should be obvious. C-Y-Z permits a husband to capitalize on the persecution of his wife to obtain asylum even though he has left his wife behind and she might never join him and he might intend that she not do so. Such an outcome in which the application of our laws would contribute to the destruction of a family union seems anomalous, at least in situations in which the husband does not make a compelling showing that if he is granted asylum his wife will be able to join him in this country. Indeed, the application

Unlike asylum, which is discretionary, the Attorney General must grant withholding of removal if the alien demonstrates a "clear probability" that, upon return to his or her home country, his or her "life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion. See INS v. Stevic, 467 U.S. 407, 104 S.Ct. 2489 (1984); Zubeda v. Ashcroft, 333 F.3d 463, 469-70 (3d Cir. 2003). An alien who fails to establish that he or she has a well-founded fear of persecution, so as to be eligible for a grant of asylum, necessarily will fail to establish the right to withholding of removal. Zubeda, id. at 469 (citing Janusiak v. INS, 947 F.2d 46, 47 (3d Cir. 1991)).

The applicant for asylum has the burden of proof to establish his or her eligibility for asylum. 8 C.F.R. § 208.13(a) (2002); Abdille v. Ashcroft, 242 F.3d 477, 482 (3d Cir. 2001). The alien must show by credible, direct, and specific evidence an objectively reasonable basis for the claimed fear of persecution. Balasubramanrim, 143 F.3d at 165.

─────────────

of our laws may be encouraging husbands to desert their wives. While we recognize that historically in persecution cases married men sometimes have come to this country first and then have been followed by their families, C-Y-Z, 21 I. & N. Dec. 915, at 920, 927 (Rosenberg, Member, concurring), still it would be useful to study the actual impact of C-Y-Z on family structures.

As we often have recognized, the substantial evidence standard of review is extremely deferential, setting a "high hurdle by permitting the reversal of factual findings only when the record evidence would 'compel' a reasonable factfinder to make a contrary determination." Abdulrahman v. Ashcroft, 330 F.3d 587, 597 (3d Cir. 2003) (quoting Elias-Zacarias, 502 U.S. at 481 n.1, 112 S.Ct. at 815 n.1). We therefore look at the adverse credibility determinations made by the IJ and BIA "to ensure that [they were] 'appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence on country conditions.'" Dia, 353 F.3d at 249 (citation omitted). While, as we will explain, we are troubled by some of the speculative statements the IJ and the BIA made, after reviewing the record as a whole we are convinced that the record evidence does not compel us to reach a conclusion contrary to that of the IJ and the BIA.

We recognize that we have counseled against placing too much weight on an airport interview, especially when the IJ and BIA lack important information as to the manner in which the interview was conducted. Xie, 359 F.3d at 246; Mulanga v. Ashcroft, 349 F.3d 123, 137 (3d Cir. 2003) ("immaterial discrepancies between airport interviews and subsequent testimony should not be used to make adverse credibility determinations"); Ezeagwuna v. Ashcroft, 325 F.3d 396, 408 (3d Cir. 2003); Senathirajah v. INS, 157

F.3d 210, 217-18 (3d Cir. 1998); Balasubramanrim, 143 F.3d at 162-64. We also have made clear that ambiguous answers at airport interviews should not be relied upon to question the credibility of the alien later, though we have limited concern with that admonition here as Chen does not challenge the manner in which the immigration official conducted the airport interview and he does not maintain that the respondent has mischaracterized his statements made at that interview. Rather, he merely points out that the notes from the airport interview are not in the record and that it cannot be said when they were written or "whether [his] full responses were translated at the airport, or even whether he had an opportunity to make clear, as he did in immigration court, that the cadres thought he was a Falun Gong follower." Appellant's br. at 59.

On the other hand, where the discrepancies between an airport interview and the alien's testimony "go to the heart of the claim," they certainly support an adverse credibility determination. Xie, 359 F.3d at 246. Here the record is clear that Chen provided information at his airport interview markedly different from his testimony before the IJ. At his airport interview he explained that he left China because he was unable to practice Falun Gong. In contrast, Chen testified before the IJ that he was never a Falun Gong follower, but he did sell Falun Gong books at his bookstore. Furthermore, Chen never mentioned anything during his airport interview about any difficulties he or his wife had with the coercive family planning

practices in China. The only explanation Chen offered before the IJ was that the smugglers told him to inform the United States immigration officials that he was a Falun Gong follower. Both the IJ and the BIA reasonably relied on these contradictory statements in finding that Chen's testimony lacked credibility.

The IJ also cited to other discrepancies in Chen's testimony leading to his adverse credibility determination for which we find support in the record. The IJ pointed to the discrepancy in Chen's testimony regarding the length of time he stayed at his uncle's home in Changle City while he was in hiding prior to leaving for the United States. At the hearing Chen testified that he lived with his uncle until November 1999 though he informed an immigration official at an earlier interview that he stayed with a relative only until September 1999. In addition, Chen first testified before the IJ that he feared that if he returned to China he would be sterilized. When the IJ asked why the authorities would sterilize him in light of the circumstance that his wife already had been sterilized, Chen responded that he would not be sterilized and had made a mistake. The IJ also pointed to a discrepancy between Chen's testimony regarding his wife's sterilization and a letter provided by Chen from his wife. Chen testified before the IJ that his wife was apprehended by the family planning authorities at their home, while Chen's wife's letter stated that the authorities found her at her parent's home.

We recognize, however, that while

10

a review of the record evidence does not compel that we reach a conclusion contrary to that drawn by the IJ and the BIA, just as Judge Becker stated in his concurrence in Abdulrahman, 330 F.3d at 600, we note our "extreme discomfiture" with some of the statements the IJ made. The IJ dismissed Chen's testimony that his wife had an IUD inserted on the same day as an abortion on two separate occasions as "not only incredible but also implausible," reasoning that "due to the physical trauma of an abortion, the Court finds that it is unlikely and most likely physically impossible to insert an IUD in an individual who has earlier that day suffered an abortion." AR at 97. This statement is troublesome for two reasons. First, the IJ is not a physician and while he finds the evidence regarding the IUD unlikely, he does not point to evidence in the record in support of his speculation. Second, the family planning regulations from Chen's province in the administrative record clearly state that IUDs are inserted on that same day that "manual abortion[s]" take place. AR at 467.

The IJ also questioned Chen's credibility because he testified that his wife was sterilized by the family planning authorities even though there was no risk of pregnancy inasmuch as he was out of the country. The family planning regulations, however, specifically state that "[f]or those who have two children already, hospitals should cooperate with related departments and enforce sterilization operations on the spot." AR at 467. Chen's testimony that his wife was

sterilized even though he was in the United States does not strike us as implausible given the regulations and therefore it does not support an adverse credibility determination.

We also are troubled by several aspects of the BIA decision dismissing Chen's appeal. The BIA noted that Chen failed to support his claim that he was persecuted for selling Falun Gong books with "objective evidence that a bookstore owner may have acquired over the years to corroborate his claim that he owned a bookstore and that the bookstore was closed." AR at 3. We have explained in the past that "the BIA may . . . sometimes require corroboration of otherwise-credible testimony." Abdulai, 239 F.3d at 545. In Abdulai, id. at 554, we deferred to the three-part inquiry developed by the BIA in In re S-M-J, 21 I. & N. Dec. 722 (1997), for analyzing whether an alien should have offered corroborating evidence. The three-part test requires the BIA to: (1) identify the facts for which it was reasonable to expect corroboration; (2) conduct an inquiry as to whether the applicant has provided corroborating evidence; and (3) if he or she has not provided such corroborating evidence, address whether the applicant adequately has explained his or her failure to do so. Mulanga, 349 F.3d at 133-34; Abdulai, 239 F.3d at 554. In this case the BIA failed to follow the test S-M-J set forth and explain why it was reasonable to expect such corroboration and whether Chen adequately explained his failure to provide it.

The BIA also explained that Chen

11

had failed to prove a well-founded fear of persecution on account of China's coercive family practices because he acknowledged that he would not face sterilization if he returned to China. However, as we explained above, if the IJ and BIA found Chen credible, he would be eligible for asylum under the BIA's decision in In re C-Y-Z, 21 I. & N. Dec. at 918, because he stands in the shoes of his wife who was subject to forced abortions and coerced sterilization. Therefore, even assuming that Chen would not face sterilization himself if he returned to China, this circumstance would not affect his eligibility for asylum.

We also note that the BIA rejected the validity of the two abortion certificates submitted by Chen because the Department of State's country report states that "such purported certificates, if they exist at all, may be documents issued to women who voluntarily submit to an abortion and are entitled to the resulting benefits." AR at 2, 361-62, 364-65. We previously have questioned such wholesale reliance on the Department of State's country reports, quoting with approval Galina v. INS, 213 F.3d 955, 959 (7th Cir. 2000), that "[t]he country report is evidence and sometimes the only evidence available, but the Board should treat it with a healthy skepticism, rather than, as is its tendency, as Holy Writ." Lin v. INS, 238 F.3d 239, 248 (3d Cir. 2001); see also Ezeagwuna, 325 F.3d at 407. The BIA "cannot hide behind the State Department's letterhead." Lin, 238 F.3d at 246. Therefore, it erroneously rejected the validity of the abortion certificates based on nothing more than the country report.

While we recognized in Liu v. Ashcroft, 372 F.3d 529, 534 (3d Cir. 2004), that remand is appropriate where "we have made a legal determination (e.g., regarding admissibility of evidence) that fundamentally upsets the balancing of facts and evidence upon which an agency's decision is based," that decision is inapplicable here. In Liu we made clear that the improper rejection of unauthenticated abortion certificates by the IJ infected the adverse credibility determination. But the differences between Liu and this case are apparent. The discrepancies in the testimony of the Lius were much less dramatic than the differences in Chen's airport interview and his testimony before the IJ. Furthermore, the IJ's rejection in Liu of the petitioners' credibility was intertwined inextricably with his unwillingness to consider the abortion certificates because they were not authenticated. In contrast, here the IJ's adverse credibility determination related to the discrepancy between the airport interview and Chen's testimony as to his relationship with Falun Gong and thus was separate and apart from the IJ's improper speculation as to the insertion of the IUD on the same day as the abortions, among other stated grounds. We therefore conclude that Liu does not compel us to remand this case to the BIA or even justify us in doing so.

V. CONCLUSION

12

While we have noted our difficulties with the decisions of both the IJ and the BIA, as we explained above, "the overriding consideration here must be the extraordinarily deferential standard mandated by Elias-Zacarias." Abdulrahman, 330 F.3d at 598. After reviewing the administrative record we find that the record does not compel a contrary credibility finding here. The inescapable conclusion that we must draw is that there are unimpeachable bases on which to arrive at the conclusion that the IJ and BIA did that Chen was not credible and thus he was not entitled to asylum or the withholding of removal. For all the reasons we have stated, we will deny the petition for review.