

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-2005

# Weng v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4606

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Weng v. Atty Gen USA" (2005). *2005 Decisions.* Paper 57.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/57

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 04-4606

———————

YU CHONG WENG,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

———————

On Petition for Review of an Order of the Board of Immigration Appeals
No. A79-299-748

———————

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 13, 2005

BEFORE:  SLOVITER, SMITH and STAPLETON,
Circuit Judges

(Opinion Filed: December 22, 2005)

———————

OPINION OF THE COURT

———————

STAPLETON, Circuit Judge:

Yu Chong Weng is a married father from Fujian Province of the People's Republic of China. Weng left China in 2000 and entered the United States. In response to removal proceedings, Weng filed for asylum, withholding of removal, and relief under the Convention Against Torture Act. Among other reasons, Weng petitioned for asylum because he was persecuted under China's coercive population control program because his wife was forcibly sterilized. The only substantial issue before this Court is the denial of Weng's application for asylum on that ground.[1]

According to Weng, his wife has born three children in violation of China's one-child population control policies – a daughter born in 1987, a second daughter in 1989, and a son in 1994. Weng testified that he and his wife kept all three pregnancies and births secret from the authorities. He and his wife gave their second daughter away in 1989 to avoid detection by the government. His eldest daughter was eventually registered with the government when she attended school in 1993 and Weng paid a fine for registering her late. After his daughter's late registration, Weng said that officials visited him and his wife and encouraged her to be sterilized. The couple refused and later that year Weng's wife became pregnant again. Weng testified that his pregnant wife hid in a remote area to avoid the authorities, who visited her home when she did not attend her

---

[1] Contrary to petitioner's suggestion, we perceive no "abuse of discretion, tantamount to lack of, or excess of jurisdiction" in the BIA's "affirming without opinion." Br. Petitioner at 1. The BIA issued an opinion in this case.

2

mandated medical check-ups. Their son was born in 1994, and when authorities learned of this, Weng testified that officials again demanded that his wife be sterilized. Weng testified that his wife did not want to be sterilized but that they went to the hospital and underwent the procedure in September 1995. They also registered their son and paid another fine. After this, Weng testified that he and his wife became involved in underground churches in China and that he eventually left China because he feared police inquiry after an incident in which he helped a Christian escape the country.

The Immigration Judge ("IJ") refused to credit Weng's testimony that his wife had been forced to undergo an involuntary sterilization or his testimony regarding religious persecution. The Board of Immigration Appeals ("BIA") agreed with the IJ's decision, concluding that Weng had "failed to meet his burden of proof for asylum." Decision of the BIA, A.R. at 2. Weng does not press his religious persecution claim before us.

The BIA had jurisdiction over this case under 8 C.F.R § 1003.1(b) and we have appellate jurisdiction to review any final order of removal under 8 U.S.C. §§ 1252(a)(1), 1252(b). *See Dia v. Ashcroft*, 353 F.3d 228, 234-36 (3d Cir. 2003) (en banc); *Abdulai v. Ashcroft*, 239 F.3d 542, 548-49 (3d Cir. 2001). We ordinarily review only the decision of the BIA, but "when the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA." *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004).

We review decisions that petitioners fail to establish their eligibility for asylum under the "substantial evidence" standard. *Id.* at 223. Under this "extremely deferential"

3

standard, *id.* at 223, we may only reverse if a review of the record indicates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. 1252(b)(4)(B). The rejection of an asylum claim may rest on a requirement that the asylum seeker provide corroboration – even corroboration of otherwise credible testimony. *Abdulai*, 239 F.3d at 554. We have interpreted BIA precedent to find that:

> (1) an applicant need not provide evidence corroborating the specifics of his or her testimony unless it would be 'reasonable' to expect the applicant to do so; but (2) if it would be 'reasonable' to expect corroboration, then an applicant who neither introduces such evidence nor offers a satisfactory explanation as to why he or she cannot do so may be found to have failed to meet his or her burden of proof.

*Zheng v. Gonzalez*, 417 F.3d 379, 382 (3d Cir. 2005) (citing *Abdulai*, 239 F.3d at 551). Congress has mandated that "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4)(B).

In order to be eligible for asylum, an alien bears the burden of establishing that he is a "refugee" under 8 U.S.C. § 1101(a)(42)(A) "by credible, direct, and specific evidence." *Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir. 2004). In pertinent part, the statute defines "refugee" as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of . . . political opinion . . .

8 U.S.C. § 1101(a)(42)(A). That statute specifies that:

4

> a person who has been forced to abort a pregnancy or to undergo
> involuntary sterilization, or who has been persecuted for failure or refusal to
> undergo such a procedure or for other resistance to a coercive population
> control program, shall be deemed to have been persecuted on account of
> political opinion.

*Id.* The BIA has found that "past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse" – that "the husband of a sterilized wife can essentially stand in her shoes" to make his asylum claim. *C-Y-Z*, 21 I. & N. Dec. 915, 917-18 (BIA 1997).

In the portion of the IJ's opinion cited by the BIA, the IJ concluded that Weng had not met his burden to establish that his wife's sterilization was involuntary. Weng produced a hospital X-ray as evidence of his wife's sterilization. The IJ found that, even assuming the authenticity of the document, this was not probative of whether the sterilization was voluntary or involuntary. As the IJ noted, the State Department's *China: Profile of Asylum Claims and Country Conditions* (1998) ("*Profile*") found that the Fujian province employs a "one-and-a-half child policy" – if the first child is a daughter, a couple is allowed to have another child if they wait four years. This was relevant because the IJ concluded that Weng and his wife had had only two children – a daughter born in 1987 and a son born in 1994. We find no evidence that would compel a contrary conclusion.

Weng testified to having paid several fines in relation to late registrations of his children. Given the seven years between Weng's daughter and son, and the payment of fines for late registrations, the IJ reasoned that the two-child couple was now in "total

5

compliance" with the family planning policies – a scenario the IJ noted is common in rural areas like the one in which Weng's wife and children were registered. *See Profile*, pt. IV.1.b.2., A.R. at 191. The IJ reasoned that "it could very well have been a voluntary sterilization as the couple now had two children, a girl and a boy, and were satisfied with that situation." A.R. at 20.

Record evidence supports this scenario. Weng testified that he and his wife had avoided complying with the population regulations when they first decided to become parents in part because of a desire to have a boy. Hearing Transcript, A.R. at 90 (testifying that he and his wife kept their eldest daughter's birth a secret "because of our customs, we like to have a boy, but the first one was a girl."). This preference, too, is common – according to another of the State Department reports considered by the IJ. *See Country Reports on Human Rights Practices for China* (2000) ("*Country Reports*") at § 5, A.R. at 247 (noting that female infanticide, sex selective abortions, and abandonment and neglect of baby girls "remain problems" in China). Given Weng's stated preference, once the couple successfully had a boy, sterilization may or may not have been involuntary. Weng testified that it was involuntary. However, under these circumstances, it was not unreasonable for the IJ to demand corroboration. The IJ's opinion noted that Weng's wife was in China and had not provided testimony. During the hearing, Weng testified that his wife had sent numerous documents to him for his asylum petition. When asked whether she could have provided a written account of what happened to her, Weng simply responded that she did not provide such an account. Hearing Transcript, A.R. at

6

127-28. We will not disturb the IJ's finding that the involuntary nature of this sterilization needed to be corroborated and we cannot find that a reasonable trier of fact would be compelled to conclude that corroborating evidence is unavailable. *See* 8 U.S.C. § 1252(b)(4)(B). *See also Zheng*, 417 F.3d at 382 (finding no error in an IJ's determination that corroboration was required where "lines of communication remained open" with a petitioner's relatives in China).

Nor would other evidence in the record compel a reasonable adjudicator to conclude that Weng's wife was "forced . . . to undergo involuntary sterilization." As noted by the IJ, the *Country Reports* and *Profile* indicate that China formally prohibits the use of force to compel abortions or sterilizations. *See Profile* at pt. IV.1.e, *Country Reports* at § 1.f, A.R. at 194, 228. The government primarily relies on "education, propaganda, and economic incentives as well as more coercive measures, including psychological pressure and economic penalties" to pressure citizens to comply with the policies. *Profile*, pt. IV.1.a, A.R. at 189. *See also Country Reports* at § 1.f, A.R. at 227 ("For example, all workers at a factory or other work unit might lose a bonus if one worker has a child without permission."). According to the *Profile*, in the Fujian Province "strong persuasion through public and other pressure was used" but there were no reported cases where "physical force" was employed. *Profile*, pt. IV.1.f, A.R. at 195.

The IJ found no evidentiary support to corroborate Weng's claim that his wife was forced to undergo involuntary sterilization, Weng identifies none for us, and the record evidence would not compel a reasonable adjudicator to a contrary conclusion.

7

Weng raises two challenges to the IJ's conclusion. First he argues that he does not need to establish the fact that his wife's sterilization was involuntary. He argues that, having produced a medical record to evince the fact of his wife's sterilization, he has satisfied his burden to show that this sterilization was involuntary and that if the government "wants to cast doubt on that or prove that it was voluntary, then the burden . . . lies with it." Br. Petitioner at 10. This is incorrect. As we have noted on numerous occasions, the applicant for asylum bears the burden of establishing his or her eligibility for asylum. *Chen*, 376 F.3d at 223.

Second, he argues that he could not be expected to produce evidence of the involuntary or forced nature of the sterilization because documentation of sterilizations are only provided where the sterilizations are voluntary. He does not support this assertion. The portion of the *Profile* he quotes in support of this assertion pertains to certificates by which asylum seekers seek to prove forced *abortions*; it does not relate to forced *sterilizations*. *See Profile* at pt. IV.1.d, A.R. at 193. Even if true, his argument is undercut by the fact that he produced a hospital document that purports to evince his wife's sterilization – documentation he claims is only supplied to those who consent to the procedure.

In its opinion, the BIA seemed to supplement the IJ's conclusion by adding two additional reasons to reject the credibility of Weng's claim. The BIA reasoned (1) that Weng's credibility as a witness was in doubt because of the IJ's adverse credibility finding regarding a separate religious persecution claim and (2) that "objective evidence .

8

. . pertaining to China's coercive population control policies" discussed in the IJ's opinion brought Weng's "claim's plausibility into question." Decision of the BIA, A.R. at 2. We have doubts about the validity of the first conclusion. *See Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004) (rejecting the government's "bad-faith theory of asylum law" where "one adverse credibility finding beget[s] another").

The BIA's second conclusion leaves unclear whether it was making a judgment about the claim's "implausibility." "Where an IJ bases an adverse credibility determination in part on 'implausibility' . . . such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). While "an adverse credibility determination may properly be based on implausibility or inherent improbability," we have found "there must be record support and specific, cogent reasons for such an adverse credibility determination." *Berishaj v. Ashcroft*, 378 F.3d 314, 324-25 (3d Cir. 2004). A petitioner's claim cannot be deemed implausible, and thus not credible, based on "speculation, conjecture, or an otherwise unsupported personal opinion." *Id.* at 325.

The BIA's opinion refers to "objective evidence" cited by the IJ, and the IJ's opinion does refer to both the *Country Reports* and *Profile* as describing the background country conditions. But those background reports do not indicate that Weng's claim would be implausible or inherently illogical. The State Department reports do suggest – as the IJ noted – that forcible sterilization is formally illegal in China, that the Fujian province is reputed for lax enforcement of family planning policies, and that rural areas of

9

the province employ a "one-and-a-half child policy." However, these reports also indicate that forced sterilization and abortions do still occur, *see Profile* at pt. IV.1.e, *Country Reports* at § 1.f, A.R. at 194, 228, and that once couples have two children they are "urged" to undergo sterilization. *See Profile* at pt. IV.1.d; *Country Reports* at § 1.f (describing one local province's regulations requiring sterilization of the husband or wife when they have two children), A.R. at 194, 227. The *Country Reports* recount that one local Fujian official in 1998 reported that local officials "systematically used coercive measures such as forced abortion and sterilization, detention, and the destruction of property to enforce birth quotas" – an allegation that was investigated and not directly denied by the central government. *Country Reports* at § 1.f, A.R. at 228.

In short, the country conditions evidence to which the BIA referred, while supporting the IJ's analysis, also provides support for the proposition that forced sterilizations still do occur. It thus does not make it "inherently improbable" that Weng and his wife were victims of forced sterilization. Nevertheless, this will not prevent us from upholding the BIA's conclusion that Weng failed to meet his burden to establish his eligibility for asylum by credible evidence. *See Chen*, 376 F.3d at 223, 225 (upholding the BIA's decision that a husband who claimed his wife was forcibly sterilized failed to carry his burden, despite being "troubled by . . . speculative statements" by the BIA and IJ, including the statement that the husband's claim that his wife was sterilized while he was out of the country was not plausible).

We find that the IJ's conclusion – reiterated by the BIA in its opinion – that Weng

10

failed to establish his eligibility for asylum to be supported by substantial evidence.

Accordingly, the petition for review will be denied.