

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-2006

# Zheng v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2006

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Zheng v. Atty Gen USA" (2006). *2006 Decisions*. Paper 1455.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1455

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-2006

———————

LONG MING ZHENG,
                                    Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,
                                    Respondent

———————

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A77-281-447

———————

Submitted Under Third Circuit LAR 34.1(a)
February 10, 2006

———————

Before: SCIRICA, Chief Judge, BARRY and FISHER, Circuit Judges

———————

(Opinion Filed:  March 10, 2006 )

———————

OPINION

———————


BARRY, Circuit Judge

      Long Ming Zheng, a native and citizen of the People's Republic of China,

petitions this Court for review of a final order of removal of the Board of Immigration Appeals ("BIA"). We will deny the petition.

## I.

Petitioner's testimony before the Immigration Judge ("IJ") was as follows. He married Xiu Yu Chen in December of 1987, and the couple had a daughter on December 2, 1988. Because he and his wife were underage at the time of their wedding, the couple did not register their marriage until May 27, 1991. On January 10, 1989, local family planning officials informed them that Ms. Chen was required to have an intrauterine device ("IUD") implanted within three days, and to report for quarterly IUD checks thereafter. Ms. Chen ignored the notice and, on January 16, 1989, officials arrested her and forced her to have an IUD implanted.

In June 1990, Ms. Chen discovered that the IUD had fallen out and that she was pregnant. Zheng took her to her mother's home in order to escape from the family planning officials. She returned home shortly before giving birth to a son on March 21, 1991. The following month, family planning officials paid the couple another visit, taking Ms. Chen away for an IUD insertion and ordering her to report for regular checkups. Near the end of May 1991, the couple registered their marriage so that they could register the birth of their son. They apparently were forced to pay a 1,000 RMB fine for violating the government's family planning policies.

In May 1995, Ms. Chen was informed that she was pregnant again. She went into

hiding, "[s]ometimes in friend's home, sometimes in relative's home, sometime also in her mom's home." (JA 103) Zheng testified that his mother-in-law moved in with him to help care for the two children. Although in hiding, Ms. Chen would return home occasionally to visit her children. On one such occasion, the night of August 12, 1995, family planning officials came to their home to inquire into why Ms. Chen had missed her latest IUD checkup. They discovered that she was again pregnant and took her to a hospital for a forced abortion. Two days later, she was forcibly sterilized.

Approximately four years later, on September 26, 1999, Zheng arrived in the United States at Los Angeles International Airport ("LAX"). The Immigration and Naturalization Service ("INS")[1] placed him in removal proceedings on October 29, 1999. He applied for asylum and withholding of removal on March 6, 2000 and, after a November 13, 2001 hearing, his application was denied.

In his oral opinion, the IJ found that Zheng "had memorized his testimony and when any questions were asked of him out of sequence, he had trouble in answering those accurately." (JA35) The IJ believed, for example, that Zheng gave confused testimony regarding the date the family planning officials came to force his wife to have an IUD inserted after the birth of their first child, at one time saying it occurred a month after the January 10, 1989 visit, at another on October 16, 1989, and only after some questioning

_____

[1]The INS ceased to exist as of March 1, 2003. Its functions were transferred to the Department of Homeland Security. See 6 U.S.C. § 271.

did he testify to January 16, 1989, the date provided in his affidavit. The IJ also found that Zheng gave conflicting testimony regarding the date on which he was fined 1000 RMB. Moreover, the IJ deemed it incredible that Zheng's wife would return home to visit her children during her third pregnancy, thereby risking detection, and that the children would not have moved to the mother-in-law's house, where they could be with their mother out of sight of the village officials. The IJ also based his decision in part on the disparity between the information Zheng provided to immigration officials upon his arrival at LAX and his testimony at the hearing. Finally, the IJ determined that Zheng's testimony was an "obvious fabrication" and, accordingly, found that he had "filed a frivolous application for asylum." Petitioner appealed, and the BIA affirmed the IJ's decision on July 25, 2003. This petition for review followed.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a) to review final orders of removal. Where, as here, the BIA affirms an order of removal without a substantive opinion, we review the IJ's decision. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002); *see Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001) ("When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate."). If the factual findings, including adverse credibility determinations, underlying the IJ's decision are supported by substantial evidence, they must be upheld. *See Gao*, 299 F.3d at 272; *Xie v. Ashcroft*, 359

4

F.3d 239, 242 (3d Cir. 2004).[2]  Only if "'no reasonable person' would have found the applicant incredible," *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004), may the IJ's adverse credibility determination be upset.  *See* 8 U.S.C. § 1252 (b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it . . . .") (emphasis in original).  Nevertheless, an IJ's adverse credibility determination must be based on evidence in the record and may not rest merely on speculation.  *See Gao*, 299 F.3d at 272.  That is, an IJ must base an adverse credibility determination on "specific[,] cogent reasons," *id.* at 276, such as "inconsistent statements, contradictory evidence, and inherently improbable testimony."  *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (citation and internal quotation marks omitted).[3]

### III.

Zheng had "the burden of proof to establish his . . . eligibility for asylum." *Chen*, 376 F.3d at 223.  "The alien must show by credible, direct, and specific evidence an objectively reasonable basis for the claimed fear of persecution."  *Id.*

In support of his application, Zheng contended in his affidavit that on January 10,

---

[2]We need not, however, accept findings not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481; *Guo v. Ashcroft*, 386 F.3d 556, 561 (3d Cir. 2004).

[3]We note that section 101(a)(3) of the Real ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 305, affects an alien petitioner's burden of proof in this realm.  Zheng's petition, however, predates the effective date of the statute.  Consequently, we apply the "old" law to the IJ's decision.

1989, his wife was notified that she would have to report for an IUD insertion within three days. Because she did not comply, the officials forced her to have the IUD inserted on January 16, 1989. (JA130) When recounting these events at the hearing, however, Zheng testified as follows regarding the January 10 notification and his wife's decision not to comply:

> [Zheng]: Then on October 16, 1989, there was four to five family planning officer came again.
> Q: Can you tell the Court again which months of 1989?
> [IJ]: October 16, 1989, he said.
> [Zheng's Counsel]: So that's like 10 months after?
> [Zheng]: There is only one month in between two visits.
> ***
> [IJ]: . . . .You said that on October 16, 1989, four or five family planning officers and then your attorney cut you off.
> A: Yes.
> Q: What happened on October 16, 1089?
> A: They came to our home, arrest my wife, force her to have IUD insertion.
> Q: Now I'll get back to my point of confusion. You told me also that a month had passed between the two visits from the birth control officials?
> A: I don't understand why you say 1989. That's why I was confused too.
> Q: Well did it happen in 1989?
> A: Yeah, this occur in 1989. Yeah, right.
> Q: October 16th, '89?
> A: Yes.
> Q: So when you, well why did you tell me then that a month passed between the two visits of the birth control officials?
> A: Not, I'm, October. First came on January 10th.
> Q: Right. And the second time?
> A: Second time was October 16.
> Q: Eighty-nine?
> A: Yes, '89.
> Q: All right.
> ***
> [Zheng's Counsel]: Okay. You, when was the first time you got notice from the family planning office to order your wife to have an IUD

6

insertion?

[Zheng]: First time was January 10. Second time was January 16. Then they arrest her to have IUD insertion.

[IJ]: So it's not October 16th that you've been telling me?

A: Yes, October 16th. No, January 16th.

Q: Do you know what you're talking about, sir? You're getting me completely confused. You keep changing your dates here.

A: I'm very nervous.

Q: Well I can understand that, but what, the second time they came, when was that?

A: January 16, 1989.

(JA91-93.)[4] Based on the inconsistency between this testimony and Zheng's affidavit, we cannot say that "'no reasonable person' would have found the applicant incredible." *Chen*, 376 F.3d at 222. Zheng's inconsistent statements regarding the chronology of events surrounding a material issue provided a sufficient basis for the IJ's adverse credibility determination.

The IJ also found that Zheng gave conflicting testimony regarding the date on which he was fined 1000 RMB. The fine was apparently imposed sometime after the birth of his second child in March 1991. Zheng testified that in April 1991, family planning officials "again . . . came to our house and then dragged my wife" off to the hospital to have an IUD inserted. (JA99-100) Zheng stated that the officials then told them they would have to pay a 1000 RMB fine for violating the family planning policy. (JA99) It is not entirely clear if Zheng meant that they were told of the fine at the time

_____

[4]The "one month" testimony may have been based on Zheng's confusion between the events of 1989 and those of 1991. (*See* JA130)

his wife was forced to have the IUD inserted in April 1991, or sometime thereafter. After further questioning from his counsel, he testified: "As I mentioned, after the IUD insertion, when we went to register the second child and we were told we already violate the family planning policy, therefore, they give us a fine for 1,000 RMB." (JA100) Zheng testified that after they paid the fine, they were permitted to register their second child. His counsel then inquired of him:

> Q. Before you could register your second child in your household registry, is there anything else you have to do?
> A: Before we went to register, first they come to arrest my wife and then force her to have IUD insert. Then they tell my wife she's not allowed to have any more child. If she ever have any more child, they are going to sterilized her.

(JA101) Zheng dates the registry of the second child as May 27, 1991, the day on which he also contends they paid the 1,000 RMB. (JA101-02)

> The IJ summarized this testimony when assessing Zheng's credibility:
>
> The respondent . . . testified that in the end of April 1991, cadres came to his wife's home and took her to the village hospital. He states that at that time an IUD was inserted in his wife and that he and his wife were fined 1,000 RMB. . . . The respondent then changed the testimony and stated that when he went to register his second child was the time that he and his wife were fined the 1,000 RMB. Naturally this contradicts the respondent previously stating that the fine was levied at the time the IUD was inserted. The Court also notes that the affidavit submitted by the respondent gives a different rendition and states that he was fined the thousand RMB on May 27, 1991, when they went to register their marriage. Consequently, the Court within a short period of time has heard three different renditions as to when the fine was levied against the respondent . . . .

(JA37)

It is not entirely clear that Zheng testified that he and his wife were fined at the time of the April 1991 IUD insertion. He testified that after the insertion, the officials *then* told them they had violated the family planning policy and would be subjected to a fine. (JA99) He then stated that the fine was imposed at the time of registering his second child, May 27, 1991, the date, according to his affidavit, he and his wife "went to have [their] marriage registered for the purpose of registering [their] second child." (JA131) To us, his account – that the IUD was inserted in April 1991 and that, thereafter, in May 1991 they went to register their marriage in order to register their second child, only to be fined – is certainly consistent with the documentary record and one reasonable reading of the hearing testimony.

Nevertheless, Zheng's testimony can be read to state an April 1991 fine. (*See* JA99 ("They took her to village hospital [in late April 1991]. Then they told her and we have two children which is already violate the government policy allowed. Therefore, they give us a fine for 1,000 RMB.").) Moreover, Zheng failed to mention anything about the marriage registry in describing the events of May 27, 1991, despite the opportunities provided by his counsel's questions, such as, "was there anything else you did on that day?" In short, the record does not compel a contrary finding to that of the IJ. 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.").

Zheng's testimony then turned to the events surrounding the birth of his third child

in 1995.  The IJ did not credit his account:

> [T]he Court doubts that the respondent's wife would return home where she might be arrested by the cadres.  Also it makes no sense for the wife's mother to be watching the children at the respondent's home rather than at the mother's home where they would be free from the observation of the cadres and also would be in the same location where the respondent's wife was living.  Again, this particular part of his testimony was not plausible.

(JA38)  On these points, the IJ's determination is not supported by the record, and his dismissal of the testimony as implausible is based on nothing more than speculation.

The IJ also based his decision in part on the disparity between the information Zheng provided to immigration officials upon arrival at LAX and his testimony at the hearing.  "[W]e have counseled against placing too much weight on an airport interview, especially when the IJ and BIA lack important information as to the manner in which the interview was conducted," and "also have made clear that ambiguous answers at airport interviews should not be relied upon to question the credibility of the alien later."  *Chen*, 376 F.3d at 223-24 (citations omitted).  That having been said, an IJ is not required to ignore material discrepancies between the account a petitioner gives upon arriving in the country and the account presented in pressing an asylum claim.  *Id*. at 224 ("[W]here the discrepancies between an airport interview and the alien's testimony 'go to the heart of the claim,' they certainly support an adverse credibility determination.").  Here, Zheng made no mention of his wife's difficulties with the family planning officials in his airport interview.

Zheng explained that omission by saying, as summarized by the IJ, "that he did not

10

know anything about asylum upon his coming to the United States, nor that he would have to mention that he was persecuted in order to be allowed to stay in the United States." (JA40) The IJ found it "extremely difficult . . . to believe that any person coming from China to the United States does not know about asylum and does not know how to go about obtaining asylum." (*Id.*) We know of no support for any presumption that asylum applicants know "how to go about obtaining asylum" upon arriving in the United States. Consequently, we do not deem Zheng's omission to constitute a discrepancy going to the "heart of his claim," and do not believe it sufficient on its own to underlie an adverse credibility determination. *Cf. Balasubramanrim v. INS*, 143 F.3d 157, 164 (3d Cir. 1998) ("That there were some inconsistencies between the airport statement and [the petitioner's] testimony before the immigration judge is not sufficient, standing alone, to support the Board's finding that [the petitioner] was not credible.").

The IJ did not, however, rely exclusively on speculative findings regarding the events surrounding the 1995 pregnancy and the airport interview. Therefore, "[w]hile . . . we are troubled by some of the speculative statements the IJ . . . made, after reviewing the record as a whole we are convinced that the record evidence does not compel us to reach a conclusion contrary to that of the IJ . . . ." *Chen*, 376 F.3d at 223.[5]

---

[5]The IJ excluded a number of exhibits pursuant to 8 C.F.R. § 287.6(b)(1)-(2), which states, in relevant part:

> In any proceeding under this chapter, an official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized. . . . The

11

**IV.**

For the foregoing reasons, we will deny the petition for review.[6]

---

attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept.

(*See* JA72-76.) We held in *Liu v. Ashcroft*, 372 F.3d 529 (3d Cir. 2004), that § 287.6 "is not an absolute rule of exclusion, and is not the exclusive means of authenticating records before an immigration judge." *Id*. at 533. The IJ here, as in *Liu*, should have provided an opportunity to prove the authenticity of the documentary evidence through other means. *Id*. We note that the IJ's decision predated our decision in *Liu*; nonetheless, the argument was not raised to us nor was it exhausted before the BIA. We are, therefore, not permitted to reach it. *See* 8 U.S.C. § 1252(d) ("A court may review a final order of removal only if – (1) the alien has exhausted all administrative remedies available to the alien as of right, and (2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.").

[6]The IJ concluded that Zheng's petition was frivolous. (JA43 ("Due to the obvious fabrication of the respondent's testimony, the Court finds that the respondent has filed a frivolous application for asylum.")) Petitioner has never challenged this finding. We consequently do not reach it. *See* 8 U.S.C. § 1252(d).

12